David F. DAWSON, Petitioner,

v.

Robert SNYDER, Warden, Delaware Correctional Center, Respondent.

No. Civ.A. 96–300–RRM.

United States District Court, D. Delaware.

Dec. 15, 1997.

Kevin J. O'Connell, and Sheryl Rush–Milstead, Wilmington, DE, for petitioner.

Loren C. Meyers, Timothy J. O'Donovan, Jr., William E. Molchen, and Thomas E. Brown, Dept. of Justice, for State of Delaware, Wilmington, DE, for respondent.

## OPINION

McKELVIE, District Judge.

This is a habeas corpus case. Petitioner David F. Dawson is a state prisoner incarcerated at the Delaware Correctional Center ("DCC") in Smyrna, Delaware. Respondent Robert Snyder is the warden of the DCC. Dawson is contesting the constitutionality of his murder conviction and his death sentences.

On June 24, 1988, a jury in the Kent County Superior Court of the State of Delaware convicted Dawson of four counts of first degree murder, one count of first degree robbery, one count of second degree burglary, six counts of possession of a deadly weapon during the commission of a felony, and one count of possession of a deadly weapon by a person prohibited. The four murder counts included one count of intentional murder, one count of killing in furtherance of an escape from prison, and two counts of felony murder. On July 22, 1988, a jury sentenced

Dawson to death by lethal injection for the murder convictions, and to 100 years for the other convictions.

The Delaware Supreme Court affirmed Dawson's convictions and sentences on direct appeal. *See Dawson v. State*, 581 A.2d 1078 (Del.1990) (*"Dawson I"*). Dawson subsequently petitioned the United States Supreme Court for a writ of certiorari to consider whether constitutional error occurred when, during the penalty hearing, the Superior Court admitted evidence that was not relevant to any issue being decided during the punishment phase. The United States Supreme Court granted certiorari, and on March 9, 1992, it found that this constituted constitutional error. Thus, the United States Supreme Court ordered the death sentences vacated, and remanded the case for further proceedings to determine whether the error was harmless. *See Dawson v. Delaware*, 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992).

On remand, the Delaware Supreme Court concluded that the error was not harmless. *See Dawson v. State*, 608 A.2d 1201 (Del. 1992). Accordingly, it reversed the death sentences and remanded the matter to the Superior Court for a new sentencing hearing. Dawson subsequently moved for a change of venue from Kent County to New Castle County on the grounds that pre-trial publicity of the escape and murder prejudiced him, and that an impartial jury could not be impaneled in Kent County. The Superior Court granted this motion.

In March 1993, following a second penalty hearing, a New Castle County jury unanimously recommended death sentences for each first degree murder conviction. On April 2, 1993, Judge Henry duPont Ridgely sentenced Dawson to death by lethal injection after independently reviewing the jury's recommendation, as required by Delaware's newly amended death penalty statute. *See* DEL.STAT.ANN. tit. 11 § 4209. The Delaware Supreme Court affirmed these sentences on direct appeal. *See Dawson v. State*, 637 A.2d 57 (Del.1994) (*"Dawson II"*).

Dawson filed a motion for postconviction relief in the New Castle County Superior Court alleging ineffective assistance of counsel. While the court considered this motion Judge Ridgely ordered venue returned to Kent County, and on June 9, 1995, he denied Dawson's motion for postconviction relief. *See State v. Dawson*, 681 A.2d 407 (Del.Super.Ct.1995) (*"Dawson III"*). On April 17, 1996, the Delaware Supreme Court affirmed this decision and remanded for the limited purpose of setting an execution date. *See Dawson v. State*, 673 A.2d 1186 (Del.Super.1996) (*"Dawson IV"*), *cert. denied*, —— U.S. ——, 117 S.Ct. 127, 136 L.Ed.2d 76 (1996). Judge Ridgely scheduled Dawson's execution for June 13, 1996.

On June 10, 1996, Dawson filed a petition for a writ of habeas corpus in this court claiming several constitutional infirmities in his trial and penalty hearings, including allegations of ineffective assistance of counsel, improper jury selection and instruction, and failure of the prosecution to divulge relevant evidence before and during the trial. The following is the court's decision on Dawson's petition for a writ of habeas corpus.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

The court draws the following facts from a number of sources: the Delaware Supreme Court's findings in its decision on Dawson's direct appeal in 1990, *Dawson I*, 581 A.2d 1078 (Del.1990); the Delaware Supreme Court's findings in its 1994 decision on Dawson's direct appeal from his second penalty hearing, *Dawson II*, 637 A.2d 57 (Del.1994); the Superior Court's 1995 findings in its decision on his motion for postconviction relief, *Dawson III*, 681 A.2d 407 (Del.Super.1995); the Delaware Supreme Court's findings in its 1996 decision on Dawson's appeal from the Superior Court's denial of his motion for postconviction relief, *Dawson IV*, 673 A.2d 1186 (Del.1996); and this court's independent review of the record of the state court proceedings and the parties' briefs.

### A. *After the Escape from Prison*

Sometime between 1:00 a.m. and 2:30 a.m. on December 1, 1986, four inmates escaped from the Delaware Correctional Center in Smyrna, Delaware. The inmates were David

Dawson, Larry Nave, Mark McCoy, and Richard Irwin.

After Dawson, Nave, McCoy and Irwin escaped, the four men began heading north on foot. Shortly thereafter, a car turned the corner where the men were, and without any discussion the group split up. Dawson headed south, while Nave, McCoy and Irwin went north.

### 1. *Dawson and the Murder of Mrs. Kisner*

Not far from where Dawson left the other three escapees, a 1979 Oldsmobile Starfire was stolen from the south side of Smyrna. Sometime before 6:30 a.m. the car was discovered abandoned on County Road 139 between Smyrna and Kenton, a few miles from where it was stolen.

Approximately two to four miles from the abandoned car, Frank and Dorothy Seeney left their home near Kenton and went to work at 6:30 a.m. When Dorothy Seeney returned home that afternoon, she discovered that while they were at work, somebody broke into their house and stole a black leather motorcycle jacket, containers holding loose change, and several pocket watches.

Approximately a half-mile from the Seeney residence, Richard Kisner and his sixteen-year-old son, Brian, left for work and school sometime before 7:45 a.m. Madeline Kisner, Brian's mother, was in the shower getting ready for work when they left the house. Mrs. Kisner typically left for her job at Rothwell's Garage around 8:30 a.m.

At approximately 3:30 p.m., Brian arrived home from school. As Brian walked past his parent's room to his room, he noticed his mother in her red housecoat laying on her back across her bed. Brian assumed she was ill and had come home early from her job. He decided not to disturb her. Brian went to his room to change his clothes, and then he went to the kitchen to remove his contact lenses. Sometime before 4:00 p.m., Alice Holman, one of Mrs. Kisner's colleagues at Rothwell's Garage, called and spoke with Brian. She told Brian that Mrs. Kisner never arrived at work that day.

Brian walked back to his parent's room and stood in the doorway. He called out to his mother, but he did not receive a response. He then noticed a pool of blood around her head. Brian went into his room and armed himself with a hunting knife he kept there. Brian observed that one of the baseball trophies he kept on a shelf near the door was missing. Brian called the police, and then he locked himself in the pickup truck in the driveway and waited for the police.

When the police arrived, they discovered Mrs. Kisner on her bed, her red housecoat opened, her bra exposed. A pool of blood surrounded Mrs. Kisner's head. Shoe laces bound Mrs. Kisner's hands, and a sock placed over her mouth and knotted at the back of her head gagged her. A nylon stocking around her neck appeared to have been used in an attempt to strangle her. The base of a trophy lay near the bed. There were twelve stab wounds in her neck and chest areas.

Mr. Kisner arrived home from work at approximately 5:30 p.m. and learned what happened. When Mr. Kisner went through the house he found money and the keys to Mrs. Kisner's 1986 LeBaron missing. The LeBaron, parked in the driveway when Mr. Kisner left for work that morning, was also missing. Mr. Kisner informed police that Mrs. Kisner habitually carried two-dollar bills in her wallet.

Around 7:30 p.m., Geraldine Ryan began speaking with a man in the Zoo Bar, a bar located in Milford, approximately twenty miles southeast of Kenton. Ryan's roommate, Patty Dennis, was playing pool in the bar, and she observed Ryan talking with a man wearing a black leather hat and a black leather jacket that was too large for him.

Approximately an hour later, Dennis, Ryan, and the man Ryan spoke with left the Zoo Bar, to go to the Hide-A-Way, a bar located outside of Milford. As they were leaving, the man referred to himself as "Abaddon," Dawson's nickname. After an hour at the Hide-A-Way the bartender asked them to leave after an incident between the man and Ryan. The three returned to the Zoo Bar, and within five minutes he was thrown out of the bar for being disorderly.

Around 9:30 p.m., Sergeant Keith Hudson, a Milford police officer, noticed a person matching Dawson's description, wearing a black leather jacket and hat, leave the Zoo Bar. Sergeant Hudson and another officer lost the individual they suspected was Dawson after he went around a corner not far from the Zoo Bar. However, Sergeant Hudson did discover Mrs. Kisner's 1986 LeBaron in a parking lot about half a block from the Zoo Bar. He found a carton of cigarettes and a bag of corn chips inside the car. Tests later showed that each of these items bore Dawson's fingerprints. Sergeant Hudson also found in the car a postcard signed "Abaddon."

At approximately 10:30 p.m., Trooper Douglas Hudson of the Delaware State Police received a call to investigate a one car accident on Sussex County Route 207 in Lincoln, approximately two miles from Milford. Trooper Hudson discovered a car with Texas tags abandoned in a ditch. Trooper Hudson found a black leather hat in the car. When he ran a registration check, the results did not show that the car was stolen.

At approximately 2:00 a.m. on December 2, after having the car towed to a garage, Trooper Hudson first learned of the search for Dawson when another officer showed him a picture of Dawson. In the picture, Dawson wore a hat similar to the one Trooper Hudson had seen in the car. Trooper Hudson went to retrieve the hat from the car, and at this time he found papers listing a Milford address inside. Trooper Hudson went to this address, located near the Zoo Bar, and determined that the car had been stolen.

Trooper Hudson and other officers returned to Lincoln and began a house to house search for Dawson. At approximately 5:25 a.m. on December 2, Trooper Hudson discovered Dawson hiding on the floor of a car less than a half mile from the Route 207 accident involving the car with the Texas tags.

When Trooper Hudson arrested Dawson, Dawson was wearing the black leather jacket stolen from the Seeney residence. The police found four of the Seeney's watches in the jacket pockets. Police also discovered a cotton sock in one of the pockets. This sock matched the one used to gag Mrs. Kisner. Dawson also had a two-dollar bill, two Excedrin bottles filled with coins, and a small knife.

### 2. Nave, McCoy and Irwin

In the early hours of December 1, while events transpired in Kenton, a 1965 Mustang was stolen from north Smyrna. Around 6:15 a.m., police located the car, abandoned and broken down, about a half-mile from Fieldsboro, which is approximately eight miles north of Smyrna. The police recovered a fingerprint from the right front window, later identified as McCoy's, and an address book from the back seat, later determined to belong to Nave.

Around 5:45 a.m., the operator of the Fieldsboro Service Station, Wilbert Dill, arrived for work. As Dill drove into the parking lot, he noticed three men standing by the bathroom. The men all wore identical blue clothing. After entering the station, Dill watched the men attempt to break into several vehicles in the area. Dill last saw the three men at approximately 6:45 a.m. Dill later identified the men as Nave, McCoy, and Irwin.

Around 6:35 a.m., Nave's sister, Kathleen Spence, received the first of two telephone calls placed from the Fieldsboro Service Station. Approximately ten minutes later she received the second phone call. Spence later told officials that she drove to the service station, picked up three men, and provided them with new clothing. Later that day, she drove them northward into New Castle County. At approximately 6:30 p.m. Spence left the three men.

During the early hours of December 2, three men kidnaped a woman, Donna Boyer, from a parking lot in New Castle County, drove her around Delaware and into Pennsylvania, and released her several hours later in the parking lot of a motel. Boyer later identified Nave, McCoy and Irwin as the three men that kidnaped her.

On December 11, Delaware state police learned of the two calls placed from the telephone outside the Fieldsboro Service Station. The police subsequently conducted a taped interview with Spence. Spence admit-

ted that Nave called her and requested that she come pick up him, McCoy and Irwin. She told the police that she refused to help them. Spence later admitted assisting the three escapees.

Police arrested Nave, McCoy and Irwin in Arizona on December 22, 1986, sometime after they robbed a convenience store near St. George, Utah. In the three weeks after their escape from DCC, the three men committed a series of crimes in which they threatened their victims with knives, and bound their hands and feet with cord. At the time of Nave's, McCoy's and Irwin's arrest, the police found several stolen items in their possession, including knives and firearms.

### B. *Events Before Dawson's Trial*

On December 5, 1986, three days after Dawson's arrest, Dawson appeared at a preliminary hearing before the Kent County Court of Common Pleas. The two attorneys appointed to represent Dawson, Joseph A. Gabay and Duane Werb, did not meet with him prior to the hearing.

During the early part of 1987, the public defender's office appointed James R. Lally and David M. Lukoff to replace Gabay and Werb as Dawson's counsel. Dawson then allegedly sent to the public defender's office several unanswered letters, requesting an opportunity to meet with his new counsel.

In November 1987, the public defender's office replaced Lally and Lukoff with attorneys Paul S. Swierzbinski and John S. Edinger. On November 27, 1987, Swierzbinski met with Dawson to gather background information from him. Raymond J. Otlowski replaced Edinger in early 1988.

On April 13, 1988, Swierzbinski and two investigators from the public defender's office met with Dawson to discuss Dawson's version of what occurred on December 1, 1986. In an affidavit Swierzbinski later prepared in response to allegations of ineffective assistance of counsel he stated that the evidence he reviewed, and much of what Dawson told him at this meeting, was inconsistent with a statement Dawson made to DCC corrections officers around December 9, 1986.

In Dawson's statement to DCC corrections officers he said that after the four men escaped they walked into Smyrna where they stole a car and drove north. Dawson stated that McCoy drove, Nave sat in the right front seat, and Irwin sat in the left back seat. The foursome abandoned the car outside of Fieldsboro and returned to Smyrna on foot after unsuccessfully looking for another car to steal and failing to convince Kathleen Spence to assist them. It took them an hour-and-a-half to walk from the Fieldsboro area to Smyrna.

Dawson stated that after arriving in Smyrna they stole another car. Dawson drove for at least a half-hour before he wrecked the car somewhere outside of Kenton. Dawson said that he burglarized the Seeney residence alone, and then he entered the Kisner house. Dawson contended that while he was tying up Mrs. Kisner, Nave, McCoy and Irwin entered. Dawson stated that he subsequently left the Kisner residence to get gasoline for Mrs. Kisner's LeBaron, and when he returned, Mrs. Kisner was dead and the other three escapees had left the house.

In contrast with the December 1986 statement, during the April 1988 meeting with Swierzbinski, Dawson admitted that he split from the other three men shortly after the escape. He also admitted burglarizing the Kisner residence without any assistance. However, Dawson continued to deny killing Mrs. Kisner.

### C. *Dawson's Trial*

Dawson's trial for the murder of Mrs. Kisner began in June 1988. Prior to the commencement of jury selection, Dawson moved for a change of venue, claiming that pretrial publicity about his case and hostility directed toward him in Kent County prevented the court from impaneling an impartial jury in that forum. The Superior Court denied Dawson's motion on May 10, 1988.

#### 1. *Jury Selection*

Jury selection for Dawson's trial began on June 6, 1988. As agreed by the parties, Judge Ridgely conducted individualized voir dire of approximately 130 venirepersons over

a four day period. Judge Ridgely impaneled twelve jurors and four alternate jurors.

Six selected jurors told the court during voir dire that they did not have any knowledge of the facts and issues relating to Dawson's case. Although nine jurors had admitted hearing media reports about Mrs. Kisner's death and Dawson's subsequent arrest, they stated that this exposure was limited to the December 1–2 time period. One of these nine jurors, Francis Angel, stated during voir dire that he would be able to render a fair and impartial verdict based exclusively on the law and evidence presented at trial, despite having some knowledge of the facts and issues related to Dawson's case. Dawson's counsel moved to excuse Angel for cause. The court denied the motion, concluding that Angel could be impartial.

The sixteenth juror was Buel Parrish, an African–American. After being told of Dawson's affiliation with a white supremacist organization called the Aryan Brotherhood, Parrish stated that he could remain fair and impartial. Parrish further stated that he inadvertently read part of a newspaper article about Dawson's case during the jury selection process, but in compliance with the court's instruction that the jury pool avoid exposure to news reports relating to the case, he stopped reading once he realized what the article was about. Parrish said that he had not formed an opinion about Dawson's guilt or innocence and could remain fair and impartial despite having read the article. Parrish also mentioned that although his brother was the victim of an unsolved murder in 1978, he would not allow his family history to affect his impartiality as a juror. Dawson's counsel moved to strike Parrish for cause. The court denied the motion, finding Parrish impartial based on his responses to voir dire questions.

All sixteen jurors, including Angel and Parrish, represented to the court that they had not formed opinions regarding Dawson's guilt or innocence, were not biased against him, and could render an impartial verdict based solely on the evidence introduced at Dawson's trial. Thus, after the jury was selected Judge Ridgely stated: "I am satisfied that a fair and impartial jury has been selected."

## 2. The Presentation of Evidence

During the trial, the prosecution, with Ferris W. Wharton and Charles E. Butler representing the State of Delaware, presented evidence of Dawson's, Nave's, McCoy's and Irwin's activities after their escape from DCC on December 1. With respect to Dawson, the prosecution presented evidence physically linking Dawson to the murder of Mrs. Kisner. Specifically, State witnesses gave testimony regarding the results of tests the Federal Bureau of Investigation ("FBI") performed on the sock discovered in Dawson's pocket, and the clothing Dawson was wearing at the time of his arrest.

Andrew Podolak, a retired FBI special agent, performed fiber comparisons between the sock used to gag Mrs. Kisner and the one discovered in Dawson's pocket. Podolak testified at trial that the microscopic properties, as well as the color, composition, and construction of the sock found in Dawson's leather jacket matched the one used to gag Mrs. Kisner. Podolak also stated that an examination of the jacket and Dawson's T-shirt revealed red triacetate fibers that matched fibers found in Mrs. Kisner's housecoat. During cross-examination Podolak stated that a brown hair discovered at the crime scene did not match Dawson's hair, or the hairs of Richard or Brian Kisner. FBI serologists testified that blood found on Dawson's undershirt and sweatshirt contained enzyme markers inconsistent with Dawson's blood, but consistent with Mrs. Kisner's blood.

The prosecution also called Dr. Judith Tobin, the Assistant State Medical Examiner who performed the autopsy of Mrs. Kisner. Tobin determined that cardiac tamponade, a hemorrhage within the heart that prevents it from pumping, and hemorrhaging due to the stab wounds, caused Mrs. Kisner's death. Tobin testified that she could not conclude whether a particular knife caused Mrs. Kisner's wounds. Instead, she could only conclude that the murder weapon was a sharp, knifelike instrument.

The prosecution presented evidence of the theft of several cars in Kent County in the

early hours of December 1. Dawson was not indicted on charges relating to these thefts, and therefore, the court permitted the prosecution to introduce this evidence provided that it could link the stolen cars to Dawson. However, the prosecution did not proffer any physical evidence, such as fingerprints, demonstrating Dawson's presence in the vehicles. The prosecution also presented evidence of the Seeney burglary, a crime to which Dawson plead guilty.

The prosecution called Brian Kisner to the stand to testify about discovering his mother's body and the subsequent arrival of the police at his house. During cross-examination, Swierzbinski asked Brian several questions in an apparent effort to convince the jury that Brian was not being entirely truthful about the discovery of his mother's body.

With respect to Nave's, McCoy's, and Irwin's activities after the escape, the prosecution presented evidence of the theft of the 1965 Mustang abandoned outside of Fieldsboro on the morning of December 1. The operator of the Fieldsboro Service Station, Wilbert Dill, testified about watching Nave, McCoy, and Irwin attempt to break into cars near his station on that same morning. Dill further testified that he did not see Dawson that morning.

Sometime during the middle of Dawson's trial, Nave's sister, Kathleen Spence, contacted the prosecution. Spence said that she was prepared to recant her December 11, 1986, statement in which she told police that she did not assist Nave, McCoy and Irwin. Spence gave a second statement to police. Spence stated that on the morning of December 1, she received a call from Nave, and she went to get the three men at the Fieldsboro Service Station. Thus, as its final witness during its case-in-chief, the prosecution called Spence to the stand. The prosecution did not inform Dawson's counsel about Spence's proposed change in stories until shortly before she testified.

Spence testified that after receiving Nave's call she packed her car with fresh clothes for the escapees and drove to the Fieldsboro Service Station. The clothes included "about four pair of pants" and "a few shirts." Spence also testified that she did not see

Dawson on the morning of December 1, 1986. During cross-examination, Swierzbinski introduced the tape of Spence's December 11, 1986, statement and played it to the jury. Swierzbinski questioned Spence about her motivation for testifying, suggesting that she had come forward to protect Nave from being charged with Mrs. Kisner's murder.

After the prosecution rested, Swierzbinski called Kevin Castelline, a former Delaware Detective Sergeant who traveled to Arizona where he interviewed Nave and McCoy shortly after their arrest. It is unclear from the record whether Castelline also interviewed Irwin. On cross-examination Castelline stated that he concluded that Dawson separated from the other three escapees and acted alone in burglarizing the Seeney residence and killing Mrs. Kisner. Castelline also stated that there was no apparent connection between the knives found on Nave, McCoy and Irwin and Mrs. Kisner's homicide. Furthermore, reports from other jurisdictions indicated that Nave, McCoy, and Irwin obtained these knives during various burglaries and robberies committed outside of Delaware during their crime spree.

### 3. Closing Arguments

During closing arguments the prosecution argued that the evidence led to one conclusion only, that Dawson acted alone in murdering Mrs. Kisner. Specifically, the prosecution focused on Dill's and Spence's testimony, and on the abandoned Mustang near Fieldsboro. The prosecution attempted to disprove Dawson's theory that Nave, McCoy and Irwin murdered Mrs. Kisner by showing that the three men were not near Kenton.

The defense objected to statements made during the prosecution's closing argument. For example, while explaining its theory about Dawson's state of mind when he killed Mrs. Kisner, the prosecution argued:

We don't think this was a reckless killing. We don't think it was a negligent killing. We don't think it was merely a knowing killing. We think it was an intentional killing.

After an objection by Swierzbinski the court immediately instructed the jury as follows:

Members of the jury, during the closing statements just made, the Deputy Attorney General use the word we referring to we think. You are to disregard any reference of that kind. The personal opinion of the lawyers in this case should not, in any way, affect your deliberations. You are to decide this case solely upon the evidence presented at trial.

While describing the jury's duty to evaluate and weigh the evidence presented, the prosecution again used "we," arguing:

Both sides owe you the duty of giving arguments that make sense and are not refuted by other evidence that means something.... So we are still here and we are still asking ourselves why. Why? Why?

Additionally, during rebuttal the prosecution asserted that the jury verdict should "tell everyone that he [Dawson] is a murderer."

In its closing argument, the defense attempted to discredit Dill's and Spence's testimony, particularly based on Spence's December 1986 statement. The defense also highlighted the prosecution's failure to produce the murder weapon or to test the weapons found on Nave, McCoy and Irwin to determine if these three murdered Mrs. Kisner.

On June 24, 1988, a jury found Dawson guilty on four separate counts of first degree murder, one count of first degree robbery, one count of second degree burglary, six counts of possession of a deadly weapon during the commission of a felony, and one count of possession of a deadly weapon by a person prohibited.

### D. *The First Penalty Hearing*

After the jury verdict, the Superior Court conducted a penalty hearing. The prosecution sought to present evidence concerning Dawson's affiliation with a white supremacist group called the Aryan Brotherhood. Over the objections of defense counsel, the judge permitted the prosecution to provide a brief description and history of the Aryan Brotherhood.

On June 28, 1988, the jury sentenced Dawson to death by lethal injection for each of

his four murder convictions. The jury also sentenced Dawson to 100 years for the other convictions. The Delaware Supreme Court affirmed Dawson's convictions and death sentence. *See Dawson I*, 581 A.2d 1078 (Del. 1990).

### E. *Proceedings Before the United States Supreme Court*

In 1991, the United States Supreme Court granted Dawson's petition for a writ of certiorari to determine whether, during the penalty hearing, the admission of evidence concerning Dawson's white supremacist ties violated his First and Fourteenth Amendment rights. *See Dawson v. Delaware*, 499 U.S. 946, 111 S.Ct. 1412, 113 L.Ed.2d 465 (1991). On March 9, 1992, the Supreme Court ordered Dawson's death sentence vacated, ruling that evidence concerning the Aryan Brotherhood affiliation was not relevant to the charges against him and its admission therefore violated, among other things, Dawson's First Amendment right to freedom of association. *See Dawson v. Delaware*, 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992). The Supreme Court remanded the case to the Delaware Supreme Court to determine whether the admission constituted harmless error.

### F. *The Second Penalty Hearing*

On June 26, 1992, the Delaware Supreme Court ruled that the admission of evidence of Dawson's membership in the Aryan Brotherhood was not harmless error. Thus, it remanded the case to the Superior Court for a second penalty hearing. *See Dawson v. State*, 608 A.2d 1201 (Del.1992).

Dawson's counsel subsequently filed a motion for a change of venue from Kent County to the New Castle County Superior Court on the grounds that the publicity of the case prejudiced him and that an impartial jury could not be impaneled. Judge Ridgely granted the motion.

The second penalty hearing occurred in March 1993. During jury selection Judge Ridgely excused for cause several members of the jury pool because they expressed reservations about their ability to impose a

death sentence. For example, he excused Ruth Marshall after she responded "yes" to whether she would "automatically vote that the aggravating circumstances are outweighed by the mitigating circumstances because of [her] beliefs about the death penalty."

After jury selection and the prosecution's presentation of its case-in-chief, the defense called a DCC records supervisor, Cathy Guessford, to testify about Dawson's institutional record. On cross-examination, when the prosecution questioned Guessford about a notation in Dawson's record concerning his "behavioral problem" identified by prison social workers, Guessford replied, "death sentence and escape risk."

The defense immediately objected and moved for a mistrial, arguing that Guessford's testimony was prejudicial because it informed the jury that the first jury sentenced Dawson to death for the four counts of first degree murder. Judge Ridgely disagreed, stating that the jury would most likely infer that Guessford was testifying about the possibility of receiving a death sentence. However, Judge Ridgely also stated that he would read a limiting instruction to the jury to remove any prejudice potentially caused by Guessford's testimony.

The defense renewed its motion for a mistrial. In response, the prosecution noted that the particular record from which Guessford read the phrase "death sentence" was created after the United States Supreme Court ordered Dawson's original death sentence vacated. Consequently, the phrase could only be construed to mean that a death sentence might potentially be imposed. Judge Ridgely agreed and again denied the motion for a mistrial.

Judge Ridgely then instructed the jury as follows:

> Members of the jury, the fact that a defendant faces a potential death sentence to be determined by the Court is not, in and of itself, either an aggravating circumstance nor a mitigating circumstance to be considered by the jury. The last testimony of this witness is stricken. You are to disregard it.

At the conclusion of the penalty hearing, Judge Ridgely instructed the jury regarding aggravating and mitigating factors:

> After you consider whether the evidence shows beyond a reasonable doubt that one or more of the alleged statutory aggravating circumstances exists, you must also weigh and consider the mitigating circumstances and the aggravating circumstances, including but not limited to the statutory aggravating circumstances that you may already have found to exist.
>
> You must weigh all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender.
>
> \*\*\*\*
>
> You must then determine whether, based on a preponderance of the evidence, the aggravating factors outweigh the mitigating factors. The side on which the greater weight is found is the side on which the preponderance of the evidence exists.

Following deliberations, the jury recommended a sentence of death for each of the four counts of murder for which Dawson was convicted. Because Delaware's newly-amended death penalty statute applied to Dawson's second penalty hearing, the judge was not bound by the jury's recommendation, and had the authority to impose the sentence he deemed appropriate after independently weighing the aggravating and mitigating factors. *See* DEL.STAT.ANN. tit. 11 § 4209. Judge Ridgely reviewed the recommendation and independently sentenced Dawson to death by lethal injection. The Delaware Supreme Court affirmed Dawson's death sentences. *See Dawson II*, 637 A.2d 57 (Del. 1994).

### G. *Postconviction Proceedings*

On June 22, 1994, Dawson filed a *pro se* motion for postconviction relief, pursuant to Superior Court Criminal Rule 61. Because Dawson's arguments for postconviction relief included claims for ineffective assistance of counsel, the court appointed Kevin J. O'Connell and Sheryl Rush–Milstead to represent Dawson. While the court considered Daw-

son's motion for postconviction relief, Judge Ridgely ordered venue returned to Kent County Superior Court.

Judge Ridgely ordered Paul Swierzbinski and Bernard O'Donnell, Dawson's trial and appellate counsel, respectively, to prepare affidavits in response to Dawson's allegations of ineffective assistance of counsel. Judge Ridgely also permitted Dawson to submit the affidavit of Eugene J. Maurer, Jr., an expert retained to evaluate the ineffectiveness claims raised in Dawson's postconviction motion.

On September 14, 1994, Dawson sought leave to conduct discovery, and to expand the record to include any materials that might be obtained via discovery. Dawson sought discovery on the following matters:

1) any and all reports of police officers or any state or federal forensic examiners who analyzed, for their evidentiary significance, the knives and other articles seized from Nave, McCoy and Irwin following their arrest in December 1986;

2) any and all police reports generated in conjunction with the kidnaping and robberies that Nave, McCoy and Irwin had perpetrated following their escape from the Delaware Correctional Center, including, but not limited to, a kidnaping and robbery of an elderly couple in Pennsylvania whereat the victims were threatened with a knife and bound with drapery cord, a kidnaping and robbery in Sayer, Oklahoma, whereat the victims were threatened with a knife and again bound up and homicides which authorities believed Nave, McCoy and Irwin had committed in Clayton, New Mexico and in Florida;

3) copies of or access to any and all taped statements given by Kathleen Spence, any transcripts generated as a result of those statements and notes from the officers present during those statements; and

4) copies of any and all police reports generated by officers assigned to substantiate the veracity of the allegation made by

Spence that she had spent more than twelve hours with Nave, McCoy and Irwin on December 1, 1986.

The court ruled that Dawson could obtain access to "any and all taped statements not otherwise introduced into evidence given by Kathleen Spence in the possession, custody or control of the prosecution" and could expand the record in accordance with that discovery.

Additionally, on September 14, 1994, Dawson filed an amended motion for postconviction relief, and a motion for leave to conduct an evidentiary hearing to resolve certain factual issues raised in Dawson's amended motion. Judge Ridgely granted the motion and conducted an evidentiary hearing.

In the amended motion Dawson first claimed that the court should not procedurally bar[1] him from arguing that the prosecution's failure to preserve potentially exculpatory evidence, the knives found on Nave, McCoy and Irwin, violated his Sixth and Fourteenth Amendment rights because of ineffective assistance of counsel.

Following the September 1987 kidnaping trial of Nave, McCoy and Irwin, the prosecution determined that the knives found on them at the time of their arrest were not probative of any ongoing investigations or cases. Thus, the prosecution earmarked the knives for disposal at auction. Before being auctioned off, nobody tested the knives for the presence of blood that could be linked to Mrs. Kisner. In May 1988, investigators from the public defender's office contacted the Delaware state police about examining the knives, however, the State had already auctioned them off.

Judge Ridgely concluded that the knives would only be relevant if Dawson's version of events were true. After determining that the evidence did not support Dawson's account of the events following the escape, he stated that "Dawson's timetable is totally inconsistent with the evidence." *Dawson*

---

**1.** Rule 61(i)(3) states: "Any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this court, is thereafter barred, unless the movant shows

(A) Cause for relief from the procedural default and
(B) Prejudice from violation of the movant's rights."

*III*, 681 A.2d 407, 416 (Del.Super.Ct.1995). Acknowledging that Swierzbinski expressed a similar position in his affidavit, Judge Ridgely stated:

> Dawson's trial counsel reached the same conclusion. Additionally, Dawson admitted to his counsel that his initial statement that the four were together was not true and that he separated from the other three shortly after their escape.

*Id.* at 417 n. 2. Thus, Judge Ridgely concluded that failure to timely raise the preservation of evidence claim did not prejudice Dawson, and he was procedurally barred from bringing it in a postconviction proceeding. *See id.* at 415–18.

Second, Dawson claimed ineffective assistance of counsel because of appellate counsel's failure to consider whether the prosecution violated Dawson's rights to due process of the law and a fair trial by not immediately giving him Kathleen Spence's second statement to the police, the statement in which she admitted assisting Nave, McCoy, and Irwin. Judge Ridgely ruled that the prosecution's failure to turn over the statement to Dawson in a timely fashion did not violate the prosecution's obligation to produce exculpatory material. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Consequently, the alleged ineffectiveness of counsel did not prejudice Dawson. *See Dawson III,* 681 A.2d at 418–19.

Third, Dawson claimed ineffective assistance of counsel because of trial counsel's failure to have an expert examine a brown hair of caucasian origin found at the Kisner crime scene. Judge Ridgely rejected Dawson's claim because Swierzbinski stated in both his affidavit and his testimony at the evidentiary hearing that he did not hire an expert because Dawson told him that he was the only escapee present in the Kisner house on December 1, 1986. Thus, Judge Ridgely stated that "the Court accepts the testimony of Dawson's trial counsel that Dawson told him that he split from the other three escapees shortly after the breakout and went alone to the Kisner residence. Based on this statement by Dawson, it was reasonable for trial counsel not to have the hair compared to the three other escapees." *Id.* at 422.

Fourth, Dawson claimed ineffective assistance of counsel because trial counsel did not adequately consult with Dawson about whether he should testify at trial. Judge Ridgely denied this claim, relying on an affidavit from Swierzbinski stating "that he discussed with Dawson his choice of testifying or not testifying on several occasions," and on an affidavit from Dawson indicating that Dawson did not want to testify at trial and that he would notify counsel if he changed his mind. *See id.*

Fifth, Dawson claimed ineffective assistance of counsel because trial counsel neither adequately consulted with Dawson regarding the facts of the case, nor developed Dawson's version of events. Judge Ridgely rejected Dawson's argument, stating that "[t]he record shows that defense counsel investigated the case carefully," and that Dawson did not demonstrate "what evidence counsel would have discovered or introduced that would have helped the defense." *Id.* at 423.

Sixth, Dawson claimed ineffective assistance of counsel on the grounds that trial counsel did not "fully use certain discovery procedures" and failed "to make appropriate pre-trial motions and objections during the trial." *Id.* Judge Ridgely denied this claim, concluding that the record did not support Dawson's allegations, and noting that Dawson did not substantiate the claim by showing how the alleged failures affected the trial. *See id.*

Seventh, Dawson claimed ineffective assistance of counsel because prior to trial, counsel failed to sever from the indictment the count charging Dawson with possession of a deadly weapon by a person prohibited. Dawson argued that the decision to try this count with the murder charges prejudiced him because the jury consequently became aware of his past criminal record. However, Judge Ridgely stated that the count charging Dawson with murdering Mrs. Kisner in furtherance of an escape notified the jury of Dawson's incarceration for prior criminal convictions. *See id.* Thus, Dawson did not suffer prejudice from trial counsel's decision because the jury was otherwise aware of Dawson's past criminal history.

Eighth, Dawson claimed ineffective assistance of counsel because Swierzbinski failed to offer into evidence Dawson's December 1986 statement to DCC corrections officers after referring to it in his opening statement at trial. Judge Ridgely denied this claim, accepting "as reasonable counsel's belief that the State would introduce the statement, given the State's intense opposition to the defense motion to suppress" at the hearing immediately prior to opening statements. *See id.*

Ninth, Dawson claimed ineffective assistance of counsel because of the aggressive cross-examination of Brian Kisner. Judge Ridgely denied this claim, stating that he accepted Swierzbinski's "explanation that he believed he had a duty to Dawson to explore Brian's story carefully. After reviewing the record, the Court is unpersuaded that counsel's cross-examination was deficient under *Strickland.*" *Id.*

Tenth, Dawson claimed ineffective assistance of counsel because trial counsel failed to present a unified theory for his defense. Judge Ridgely denied this claim, remarking that "[a]fter a complete review of the trial and expanded record, the Court finds that trial counsel's strategy to ask sufficient questions so as to create a reasonable doubt in the minds of the jury was not unreasonable or deficient under *Strickland.*" *Id.*

Eleventh, Dawson claimed ineffective assistance of counsel because appellate counsel failed on direct appeal to raise the issue of whether the court improperly excused four prospective jurors for cause during the second penalty hearing. Judge Ridgely found that "given the record of the jury selection in this case, counsel's failure to raise this issue on appeal did not constitute ineffective assistance of counsel." *Id.* at 420.

Finally, Dawson claimed ineffective assistance of counsel because appellate counsel inadequately prepared for, and presented the case at, the second penalty hearing. Judge Ridgely denied this claim, stating that "[a]fter careful consideration of each of Dawson's

[penalty phase] claims, the Court is not persuaded that defense counsel's preparation or presentation during the penalty phase was deficient under *Strickland.*" *Id.* at 426.

Dawson also advanced other arguments which Judge Ridgely rejected pursuant to Superior Court Criminal Rules 61(i)(3) or 61(i)(4) [2] because they were procedurally barred, settled by either state or federal law, were without merit, or were "conclusory allegations ... insufficient to support [Dawson's] claim for relief." *Id.*

On April 17, 1996, the Delaware Supreme Court affirmed Judge Ridgely's denial of Dawson's motion for postconviction relief. The Supreme Court remanded the case for the limited purpose of setting an execution date. *See Dawson IV,* 673 A.2d 1186 (Del. 1996). Judge Ridgely subsequently scheduled the execution for June 13, 1996.

On June 10, 1996, Dawson filed a petition for a writ of habeas corpus in this court, and moved for a stay of execution. In the original petition Dawson raised fourteen grounds for federal habeas corpus relief.

1. The State violated his Sixth and Fourteenth Amendment rights to effective assistance of counsel and due process of the law by suppressing certain exculpatory evidence both before and during trial.

2. The Superior Court's permission to the State to introduce evidence of uncharged bad acts that were more prejudicial than probative and were not supported by an appropriate evidentiary foundation violated his Sixth and Fourteenth Amendment rights to a fair trial and due process of the law.

3. The Superior Court's failure to sequester the jury violated his Sixth and Fourteenth Amendment rights to a fair trial and due process of the law.

4. The Superior Court's permission to the State to offer its personal opinions regarding his guilt and to argue for conviction based on irrelevant matters violated his

---

**2.** Rule 61(i)(4) states: "Any ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas proceeding, is thereafter barred, unless reconsideration of the claim is warranted in the interest of justice."

Sixth and Fourteenth Amendment rights to a fair trial and due process of the law.

5. The Superior Court's permission to the State to make closing arguments that were not relevant to the aggravating factors the State was attempting to prove during the 1993 penalty hearing violated his Eighth and Fourteenth Amendment rights.

6. The Delaware death penalty statute, as administered in Delaware and applied to him, violates the Eighth and Fourteenth Amendments.

7. The death sentence violates his Eighth Amendment right to be free from cruel and unusual punishment because Delaware's death penalty statute fails to adequately narrow the group of death-eligible defendants.

8. The Superior Court's denial of his motion for a change of venue because of alleged prejudicial pretrial publicity violated his Sixth and Fourteenth Amendment rights to a fair trial.

9. The Superior Court's striking for cause certain members of the trial jury pool who were morally against the death penalty, and not permitting him to exercise more than twenty peremptory challenges violated his Sixth and Fourteenth Amendment rights to a fair and impartial jury of his peers.

10. Trial counsel violated his Sixth Amendment right to effective assistance of counsel by not adequately preparing for trial and not making appropriate objections during the trial.

11. The Superior Court's exclusion for cause of prospective jurors morally against the death penalty during the 1993 penalty hearing violated his Sixth and Eighth Amendment rights.

12. The Superior Court's permission that a witness could testify about Dawson's previous death sentences during the 1993 penalty hearing violated his Sixth and Fourteenth Amendment rights to a fair penalty hearing and due process of the law.

13. The Superior Court's improper instruction to the jury as to the State's burden of proof with respect to non-statutory aggravating factors, and misleading the jury into believing that Dawson had the burden of proving the existence of mitigating circumstances beyond a reasonable doubt during the 1993 penalty hearing violated his Sixth Amendment right to a fair penalty hearing.

14. The Superior Court's improper limitation of his right to discovery, an evidentiary hearing, and expansion of the record during postconviction proceedings in 1995 violated his Fourteenth Amendment right to due process of the law.

On June 11, 1996, the court stayed Dawson's execution pending the court's determination of his habeas petition. Additionally, Dawson filed motions for leave to conduct discovery, to expand the record, and to conduct an evidentiary hearing. In the opening briefs Dawson requested discovery on the following issues:

a) any and all police reports or other documents evidencing the investigation of crimes alleged to have been committed by the other escapees (Nave, McCoy, and Irwin) between the time of their escape and their subsequent arrest;

b) any police reports and or documents evidencing any investigation to confirm the statements given by Kathleen Spence immediately prior to the trial of David Dawson in the summer of 1988; that is, any report which evidence [sic] an investigation as to the truthfulness of what Ms. Spence now alleged—that she had been with the other three escapees (Nave, McCoy and Irwin) from approximately 7:00 a.m. until approximately 7:00 p.m. on December 1, 1986.

In the reply brief Dawson further requested "records relating to the lethal injection of the seven defendants who have been executed by Delaware since March of 1992."

On January 29, 1997, the court denied Dawson's discovery motions because Dawson failed to demonstrate with specificity that he "has actual proof to substantiate the allegations about state conduct that he seeks discovery on." *Dawson v. Snyder*, 96–300–RRM, ord. at 2 (D.Del. Jan. 29, 1997) (citing *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 301 (3d Cir.), *cert. denied*, 502 U.S. 902, 112 S.Ct. 280, 116 L.Ed.2d 232 (1991)). However, the

court noted that Dawson could renew his motions at a later date if he specifically illustrated the basis for his discovery requests.

On March 24, 1997, Dawson filed an opening brief in support of his habeas petition, attaching transcript excerpts of Larry Nave's testimony at Nave's July 1987 kidnaping trial. When respondents filed their answering brief on May 2, 1997, they moved for leave to expand the record to include the entire transcript of Nave's testimony. Dawson did not oppose the motion. Accordingly, the court will grant respondents leave to expand the record to include the entire transcript of Nave's testimony.

On June 6, 1997, Dawson filed a reply brief, and on June 11 he filed a motion for leave to amend his habeas petition to add the following claim:

Dawson's counsel rendered ineffective assistance in preparing for and conducting his defense at the 1993 penalty hearing, in violation of his Sixth and Fourteenth Amendment rights, when they unreasonably and prejudicially failed to adequately investigate matters relating to the sentence to be imposed. Specifically, Dawson's counsel failed to interview any witnesses with an eye toward demonstrating that some of the evidence put on by the State in the 1988 trial was, in fact, false; thereby creating residual doubt as to Dawson's guilt and mitigating Dawson's role in the offense.

Respondents did not oppose Dawson's motion. Accordingly, the court will grant Dawson's motion for leave to amend his petition to include the above-listed claim.

## II. DISCUSSION

The federal habeas corpus statute, 28 U.S.C. § 2254 (1997), provides that a district court will consider a petition for a writ of habeas corpus presented by an individual "in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A district court will not consider a habeas corpus petition unless the petitioner has fulfilled certain procedural requirements, such as having "ex-

hausted the remedies available in the courts of the State." Id. § 2254(b)(1)(A). State remedies are not deemed exhausted if the petitioner "has the right, under the law of the State to raise, by any available procedure, the question presented." Id. § 2254(c). However, a district court may deny the petition on the merits in spite of a petitioner's failure to exhaust the remedies available at the state level. Id. § 2254(b)(2).

Additionally, a district court shall not grant a habeas petition for any claim heard on the merits at the state level unless the adjudication of that claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

Before considering the claims in Dawson's habeas petition, the court must determine whether the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996) ("the Act"), applies to Dawson's habeas petition. President Clinton signed the Act into law on April 24, 1996. Section 104 of the Act amended the federal habeas corpus statute, 28 U.S.C. § 2254, in several ways. First, the new law provides that a federal habeas petitioner is not entitled to relief unless he can establish that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). See also Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir.1996). Second, factual findings made by a state court "shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

■ Dawson argues that newly amended § 2254 does not apply to his habeas petition because the State of Delaware did not satisfy the provisions of 28 U.S.C. §§ 2261 or 2265, which provide for special habeas corpus procedures in capital cases. Sections 2261

and 2265 entitle a state to, among other things, expedited review of habeas petitions, if the state provides an adequate procedure for appointment of counsel in state postconviction proceedings. *See e.g., Ashmus v. Calderon,* 935 F.Supp. 1048, 1055–56 & n. 4 (N.D.Cal.1996). However, the United States Supreme Court recently held that amended § 2254 applies to any habeas petition filed after the effective date of the Act, April 24, 1996, even if a state does not avail itself of these provisions. *See Lindh v. Murphy,* —— U.S. ——, ——, 117 S.Ct. 2059, 2063, 138 L.Ed.2d 481 (1997). Dawson filed his habeas petition on June 10, 1996. Accordingly, the court will apply the amended provisions of § 2254 to Dawson's claims for federal habeas corpus relief.

### A. *Procedurally Barred Claims*

■ The respondent argues that Dawson is procedurally barred from obtaining federal habeas review of several claims of ineffective assistance of counsel. In *Coleman v. Thompson,* 501 U.S. 722, 731–32, 111 S.Ct. 2546, 2554–55, 115 L.Ed.2d 640 (1991), the United States Supreme Court stated that "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state of the opportunity to address those claims in the first instance." Thus, the Supreme Court held that it "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Id.* at 729, 111 S.Ct. at 2553 (citation omitted). In the absence of the independent and adequate state ground rule, a prisoner could avoid the exhaustion requirement altogether by defaulting on federal claims in state court because the prisoner technically would have "exhausted" those claims as state remedies are then no longer available. *See id.* Accordingly, the "independent and adequate state ground doctrine ensures that State's interest in correcting their own mistakes is respected in all federal habeas cases." *Id.* at 732, 111 S.Ct. at 2555.

### 1. *Are Dawson's constitutional claims procedurally barred?*

Dawson raises several claims that he failed to raise on direct appeal, and that respondent now argues are procedurally barred. To begin with, Dawson claims that the State's failure to preserve evidence that could have been favorable to him, and suppression of certain exculpatory evidence before and during trial, violated his Sixth Amendment right to effective assistance of counsel, and his Fourteenth Amendment right to due process of the law. Specifically, Dawson claims that by not preserving the knives found in Nave's, McCoy's, and Irwin's possession at the time of their arrest, the State violated his right to due process of the law. Dawson also claims that the State violated his right to due process of the law by not disclosing in a timely manner Kathleen Spence's second statement to authorities, and that the State violated his right to due process of the law and to a fair trial when the court permitted it to introduce evidence of car thefts for which Dawson was not indicted.

Dawson also raises several claims of constitutional violations relating to the juries, both at trial and during the second penalty hearing in 1993. First, Dawson claims that at trial and during the 1993 penalty hearing, the Superior Court's improper exclusion for cause of jurors with moral scruples against the death penalty violated his Sixth, Eighth, and Fourteenth Amendment rights. Second, Dawson claims that during the 1993 penalty hearing the Superior Court's exclusion of jurors who did not make it unmistakably clear that they could never impose a death sentence, violated his Sixth, Eighth, and Fourteenth Amendment rights. Third, Dawson claims that the Superior Court's failure to sequester the jury violated his Sixth and Fourteenth Amendment rights to a fair trial and due process of the law, respectively, because of the jury's exposure to prejudicial publicity.

Additionally, Dawson claims that remarks made by the State during the trial and the 1993 penalty hearing violated his constitutional rights. First, Dawson claims that the prosecution violated his rights to a fair trial and due process of the law when it made

prejudicial remarks during closing arguments at trial. Second, Dawson claims that the prosecution violated his Eighth and Fourteenth Amendment rights by making arguments at the 1993 penalty hearing that "invited the jury to sentence him based on factors other than the aggravating characteristics of the particular offender and offense, including harm to the victim's family, the need to foster general deterrence by setting an example and otherwise appealing to the emotions and biases of the jurors."

Dawson also asserts three claims regarding the unconstitutionality of the death penalty in Delaware. First, Dawson claims that the death penalty, as administered in Delaware and applied to him, is cruel and unusual punishment in violation of the Eighth Amendment because the State has failed "to establish sufficient safeguards to minimize the problems associated with lethal injection." Second, Dawson claims that Delaware's lethal injection statute is "preempted by federal law because it permits correctional officers to obtain federally controlled substances necessary for carrying out the execution without a prescription." Third, Dawson claims that the Delaware death penalty statute violates the Eighth Amendment because it fails to adequately narrow the group of death-eligible defendants.

■ Dawson failed to raise all of the above claims on direct appeal from his convictions and sentences. When he advanced them for the first time before the Superior Court in postconviction proceedings, Judge Ridgely ruled that they were procedurally barred pursuant to Superior Court Criminal Rule 61(i)(3).[3] *See generally Dawson III*, 681 A.2d 407. On appeal, the Delaware Supreme Court affirmed all claims, except the sequestration claim and the claim that Swierzbinski provided ineffective assistance of counsel during the 1993 penalty hearing, which Dawson did not appeal. *See Dawson IV*, 673

A.2d 1186. Thus, Dawson has exhausted state remedies as to all claims, except the sequestration claim, the ineffective assistance of counsel claim relating to the 1993 penalty hearing, and the bad acts claim, which was not presented as a federal claim to the state court. *See Swanger v. Zimmerman*, 750 F.2d 291, 295 (3d Cir.1984) (stating that the federal habeas exhaustion requirement "has been judicially interpreted to mean that claims must have been *presented* to the state courts").

■ Dawson did not appeal the decision that the sequestration claim was procedurally barred. Additionally, Dawson did not present the bad acts claim as a federal claim to the Supreme Court. Therefore he has not exhausted state remedies as to these two claims. However, because Rule 61(i)(3) precludes him from seeking further postconviction relief, Dawson is excused from the exhaustion requirement. *See Teague v. Lane*, 489 U.S. 288, 297–98, 109 S.Ct. 1060, 1068–69, 103 L.Ed.2d 334 (1989) (finding that because "collateral relief would be unavailable to petitioner," "fundamental fairness" requires that the exhaustion requirement be deemed fulfilled). Additionally, Dawson did not properly exhaust state remedies as to the claim that Swierzbinski provided ineffective assistance counsel at the 1993 penalty hearing because he did not appeal this decision. However, Dawson is excused from the exhaustion requirement because he would be barred from raising the claim in the Delaware courts pursuant to Superior Court Criminal Rule 61(i)(2),[4] an independent and adequate state rule that precludes federal habeas review. *See Carter v. Neal*, 910 F.Supp. 143, 150–51 (D.Del.1995).

■ Respondent argues that Dawson is prevented from obtaining federal habeas review of these claims because Judge Ridgely found that they were procedurally barred pursuant to Rule 61(i)(3). *See Flamer v.*

---

**3.** Rule 61(i)(3) states: "Any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this court, is thereafter barred, unless the movant shows

 (A) Cause for relief from the procedural default and

 (B) Prejudice from violation of the movant's rights."

**4.** Rule 61(i)(2) states, in pertinent part, "Any ground for relief that was not asserted in a prior postconviction proceeding ... is thereafter barred, unless consideration of the claim is warranted in the interest of justice."

*Chaffinch,* 827 F.Supp. 1079, 1087–88 (D.Del. 1993) (stating that in "a federal habeas review, a procedural bar requires a finding that the procedural default is based on independent and adequate state grounds," and finding that Rule 61(i)(3) is an adequate state ground to preclude federal habeas review), *aff'd,* 68 F.3d 710 (3d Cir.1995) (en banc), *cert. denied,* 516 U.S. 1088, 116 S.Ct. 807, 133 L.Ed.2d 754 (1996). A district court is precluded from considering a procedurally barred claim unless the petitioner can demonstrate 1) both "cause for the default and actual prejudice as a result of the alleged violation of federal law"; or 2) "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 724, 111 S.Ct. 2546, 2551, 115 L.Ed.2d 640 (1991); *see also Caswell v. Ryan,* 953 F.2d 853, 860–61 (3d Cir.), *cert. denied,* 504 U.S. 944, 112 S.Ct. 2283, 119 L.Ed.2d 208 (1992).

■ To show "cause" the petitioner must demonstrate "that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). If the petitioner is successful in establishing cause, he can demonstrate prejudice by illustrating that "errors at trial ... worked to [petitioner's] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494, 106 S.Ct. at 2648.

■ Alternatively, a court can consider an otherwise procedurally barred claim on the merits if a petitioner can demonstrate that failure to do so will effect a "miscarriage of justice." *Id.* at 496, 106 S.Ct. at 2649. This exception applies only in "extraordinary cases." *Id.* at 496, 106 S.Ct. at 2649. To establish a miscarriage of justice, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him. *See Schlup v. Delo,* 513 U.S. 298, 326, 115 S.Ct. 851, 867, 130 L.Ed.2d 808 (1995).

Dawson alleges that he has cause for procedurally defaulting on almost all of the above claims because of ineffective assistance of counsel at either the trial level, on appeal,

or both. In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court articulated a two part test for evaluating an ineffective assistance of counsel claim. First, a petitioner must demonstrate that counsel's performance at trial or on appeal fell below "an objective standard of reasonableness." *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). In evaluating whether counsel performed reasonably, a court "must be highly deferential." *Id.* at 689, 104 S.Ct. at 2065. Therefore, a petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (quotation omitted). Additionally, the Third Circuit has stated that appellate counsel does not have a "duty to raise every possible claim." *Sistrunk v. Vaughn,* 96 F.3d 666, 670 (3d Cir.1996).

Second, a petitioner must illustrate that counsel's ineffective performance caused prejudice. *See Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. The Third Circuit has stated that prejudice occurs where "there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different." *Sistrunk,* 96 F.3d at 670 (3d Cir.1996) (citing *Strickland,* 466 U.S. at 668, 104 S.Ct. at 2052). The Supreme Court has cautioned, however, that when evaluating counsel's performance, a court should not "focus[ ] solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable." *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993).

Furthermore, in *Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986), the United States Supreme Court proclaimed the standard for finding appellate counsel ineffective more stringent:

'the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.' Nor can it seriously be maintained that the decision not to press the claim on appeal was an error of

such magnitude that it rendered counsel's performance constitutionally deficient under the test of *Strickland v. Washington.* [However,] 'the right to effective assistance of counsel ... may in a particular case be violated by even an isolated error ... if that error is sufficiently egregious and prejudicial.' *Id.* at 535, 106 S.Ct. at 2666 (quoting *Murray v. Carrier,* 477 U.S. 478, 486–87, 106 S.Ct. at 2644–45 (1986)) (citations omitted). *See also id.* at 536, 106 S.Ct. at 2677 (stating that the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of appellate advocacy") (quoting *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983)). Thus, Dawson can only prevail on a claim of ineffective assistance of counsel for appellate counsel's failure to raise a particular claim if failing to do so was "sufficiently egregious and prejudicial."

2. *Did failure to obtain the knives in the possession of Nave, McCoy, and Irwin, and failure to raise this issue on appeal, constitute ineffective assistance of counsel?*

Dawson admits that on direct appeal he did not raise the claims of constitutional violations for failure to preserve the knives. However, he argues that he has cause for failing to raise them because he received ineffective assistance of counsel at both the trial and the appellate levels. Dawson contends that Paul Swierzbinski, his trial counsel, "did not make any effort to obtain or analyze the potentially exculpatory knives." He also argues that he received ineffective assistance of counsel because appellate counsel, Bernard J. O'Donnell, did not consider advancing this argument on appeal.

a. *Did the State violate Dawson's right to due process by not preserving the knives found on Nave, McCoy, and Irwin, and did Swierzbinski violate Dawson's right to effective assistance of counsel by not arguing this?*

Dawson argues that his December 1986 statement to DCC correction officers implicated the other three escapees in the murder of Mrs. Kisner. Therefore, the State had "an obligation to collect, analyze and preserve any forensic evidence connected to the knives and other stolen articles seized from Nave, McCoy and Irwin following their arrest on December 22, 1986."

In *Arizona v. Youngblood,* 488 U.S. 51, 56, 109 S.Ct. 333, 336, 102 L.Ed.2d 281 (1988), the United States Supreme Court held that the State's failure to preserve potentially useful evidence does not constitute a denial of due process unless a petitioner can show that the State acted in bad faith. When Judge Ridgely denied Dawson's motion for postconviction relief he found that there was "no evidence of negligence or bad faith involved in the disposition of the knives." *Dawson III,* 681 A.2d 407, 418 (Del.Super.Ct.1995). This factual determination is presumptively correct, and unless Dawson rebuts the presumption by clear and convincing evidence, the State did not violate his due process rights by auctioning off the knives. *See* 28 U.S.C. § 2254(e)(1). *See also United States v. Stevens,* 935 F.2d 1380, 1388 (3d Cir.1991) (reviewing a district court finding that the Government did not destroy evidence in bad faith under a clearly erroneous standard).

Furthermore, in both an affidavit submitted during the postconviction proceedings, and during an evidentiary hearing before the Superior Court, Swierzbinski stated that after reviewing the evidence he concluded that Dawson's account of the events of December 1, 1986 was implausible. Swierzbinski stated that when he confronted Dawson with this conclusion, Dawson admitted that he separated from the other three escapees at around 2:00 a.m. In the postconviction proceedings Judge Ridgely made a factual finding that specifically credited Swierzbinski's account of this discussion with Dawson. *See Dawson III,* 681 A.2d at 422. Thus, Dawson must rebut these factual findings by clear and convincing evidence before he can demonstrate that Swierzbinski did not act reasonably.

Dawson told DCC corrections officers that after escaping the prison the four men stole a car and drove north toward Fieldsboro, where they abandoned the car. Dawson

claimed that McCoy drove, Nave sat in the right front seat, Dawson sat in the right back seat, and Irwin sat in the left back seat. Dawson stated that they returned to Smyrna by foot after Nave unsuccessfully attempted to convince Kathleen Spence to assist them, and that this walk took an hour and a half. Dawson alleged that upon reaching Smyrna the men stole another car, which Dawson drove for at least a half hour before wrecking near Kenton. Dawson stated that after burglarizing the Seeney residence he entered the Kisner residence. While tying up Mrs. Kisner, the other three escapees entered. Dawson then drove to Camden–Wyoming to fill Mrs. Kisner's LeBaron with gas. When he returned, Mrs. Kisner was dead, and Nave, McCoy, and Irwin were gone.

Dawson's statement is contradicted by other evidence. Nave placed two telephone calls to Spence from the Fieldsboro Service Station at approximately 6:35 a.m. on December 1. If Dawson's account were true, then after Spence rejected their request for assistance, the escapees walked to Smyrna and arrived at around 8:10 a.m. Furthermore, after driving around in another stolen car, they would have arrived in the Kenton area at approximately 8:40 a.m. Trial testimony indicated that Mrs. Kisner usually arrived at work by 8:30 a.m. Thus, she would not have been present in her house when Dawson arrived. Moreover, fingerprint evidence taken from the car abandoned near Fieldsboro revealed that McCoy probably sat in the right front seat of the car. Dawson said that McCoy drove. Police also found Nave's address book on the back floor. This is inconsistent with Dawson's testimony that Nave sat in the front seat. Furthermore, Spence ultimately admitted that she assisted Nave, McCoy, and Irwin, and that she did not see Dawson that day.

■■■ Therefore, Dawson has not met his burden of showing by clear and convincing evidence that the Superior Court incorrectly found that the State did not act in bad faith in disposing of the knives, and that Swierzbinski's conclusions should be discredited. The evidence clearly demonstrates that the State had ample reason to believe that Dawson acted alone in killing Mrs. Kisner,

and therefore the State did not violate Dawson's due process rights when it auctioned off the knives. Furthermore, the evidence also shows that Swierzbinski did not act unreasonably by, and Dawson did not suffer any prejudice from, not obtaining the knives because there exists no plausible evidence lending credence to the conclusion that Nave, McCoy, and Irwin were involved in murdering Mrs. Kisner. Therefore, Dawson did not receive ineffective assistance of counsel from Swierzbinski.

b. *Did O'Donnell violate Dawson's right to effective assistance of counsel?*

■■■ Dawson alleges that O'Donnell provided ineffective assistance of counsel by not raising the State's failure to preserve the knives, and trial counsel's failure to obtain them. Dawson can only prevail on this claim if he can demonstrate that O'Donnell's failure to raise the issue on appeal was "sufficiently egregious and prejudicial." *Smith,* 477 U.S. at 535, 106 S.Ct. at 2667.

As discussed above, auctioning off the knives did not violate Dawson's due process rights, and Swierzbinski's decision not to obtain the knives did not constitute ineffective assistance of counsel. Furthermore, the evidence clearly demonstrates that even if counsel had obtained the knives, the result of the proceeding would have been the same as the knives fail to implicate Nave, McCoy, and Irwin in Mrs. Kisner's murder. Therefore, O'Donnell's decision not to raise this issue on appeal was neither egregious nor prejudicial, and this decision did not constitute ineffective assistance of counsel.

c. *Has Dawson shown cause and prejudice or miscarriage of justice?*

■■■ Because Dawson has failed to show that he received ineffective assistance of counsel from either Swierzbinski or O'Donnell, he has not demonstrated cause for failing to raise this claim. Dawson further alleges that the court's failure to consider his claim would result in a fundamental miscarriage of justice. However, he does not provide any evidence demonstrating that it is more likely than not that no reasonable juror would have convicted him if the knives had

been admitted into evidence. On the contrary, the evidence tends to establish that the knives were wholly unrelated to Mrs. Kisner's death. Thus, because Dawson has not shown either cause and prejudice or fundamental miscarriage of justice, he is procedurally barred from raising the claim that failure to preserve or obtain the knives violated his rights to due process and effective assistance of counsel. *See Caswell v. Ryan,* 953 F.2d 853, 863 (3d Cir.), *cert. denied.,* 504 U.S. 944, 112 S.Ct. 2283, 119 L.Ed.2d 208 (1992) (concluding that because petitioner procedurally defaulted on claims, "he is now barred from urging these claims in a federal habeas petition, and [the court is] foreclosed from considering the merits").

3. *Did failure to raise on appeal the issue of the late disclosure of Kathleen Spence's second statement constitute ineffective assistance of counsel?*

Dawson admits that on direct appeal he did not raise the claim of constitutional violations for the prosecution's failure to produce Spence's second statement earlier. However, he argues that he has cause for failing to raise this claim because he received ineffective assistance of counsel from O'Donnell. Dawson relies on an affidavit, submitted to the Superior Court during the postconviction proceedings, in which O'Donnell stated that the claim regarding Spence's second statement was "never considered by either Mr. Swierzbinski or myself as a potential appellate issue." Dawson can only prevail on a claim of ineffective assistance of counsel for not raising this claim if failing to do so was "sufficiently egregious and prejudicial." *Smith,* 477 U.S. at 535, 106 S.Ct. at 2667.

■ The prosecution's failure to produce exculpatory or impeachment evidence constitutes a *Brady* violation. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) (holding that failure to produce evidence that is material to either guilt or punishment constitutes a due process violation). The State commits a *Brady* violation if it suppresses evidence which is favorable to the accused, and is material to either guilt or punishment. *See United States v. Bagley,* 473 U.S. 667, 674–75, 105

S.Ct. 3375, 3379–80, 87 L.Ed.2d 481 (1985). Favorable evidence includes both exculpatory and impeachment evidence. *See id.* at 676, 105 S.Ct. at 3380. Additionally, evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682, 105 S.Ct. at 3383.

■ The prosecution notified Dawson's trial counsel, Swierzbinski, a few hours before the final day of their case that Spence would testify. Swierzbinski did not learn about the nature of Spence's second statement until shortly before she took the witness stand. Because the prosecution delayed disclosure to Dawson's trial counsel, the court must determine whether Spence's second statement constituted exculpatory or impeachment evidence that might have changed the result of the proceedings.

Spence testified on direct examination that she assisted Nave, McCoy, and Irwin by giving them fresh clothing and driving them to New Castle County on the evening of December 1, 1986. Moreover, she also testified that she did not see Dawson on the morning of December 1, 1986. Thus, her testimony lent further support to the prosecution's theory that Dawson separated from the other escapees shortly after escaping from DCC. With the exception of her isolated reference to taking "about four pair of pants" and "a few shirts," Spence's testimony undermined Dawson's suggestion that he and his fellow inmates acted together following their escape, and therefore it was not exculpatory.

Swierzbinski cross-examined Spence about her motive for testifying. Swierzbinski noted that her brother, Nave, was one of the escapees and that she also knew McCoy and Irwin. He also introduced the tape of her December 11, 1986 statement, in which she denied assisting the three escapees. In his closing argument, Swierzbinski stated that on direct examination Spence had testified that she took "about" four sets of clothing to the Fieldsboro Service Station, implying that Dawson may not have split off from his fellow escapees. Swierzbinski apprised the jury that Spence changed her testimony, that she had a possible motivation for testifying,

and that she brought "about four pair of pants" to Fieldsboro. Nevertheless, the jury convicted Dawson.

Dawson argues that if he had received earlier notice that Spence would be called to the stand "it seems evident that the defense could have developed evidence which would have brought the Spence testimonial turnabout into serious question." However, Dawson had adequate opportunity to impeach Spence when she was on the stand, and he has not offered any evidence demonstrating how he would have conducted his defense differently had he received Spence's second statement at an earlier stage of the proceedings. For example, Dawson does not show how he would have altered his attempts to impeach Spence's testimony. *See United States v. Higgs,* 713 F.2d 39, 44 (3d Cir.1983), *cert. denied sub nom. Kemp v. United States,* 464 U.S. 1048, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984) (finding that disclosure of certain impeachment material on the day that a witness testifies "will fully allow appellees to effectively use that information to challenge the veracity of the government's witnesses.").

The court therefore finds that Dawson's *Brady* claim is without merit. Dawson has not presented any evidence demonstrating that the result of the proceedings would have been different if the prosecution had presented Spence's statement earlier. Thus, Dawson cannot show that O'Donnell's decision not to raise this issue on appeal was either egregious or prejudicial. Accordingly, Dawson cannot show cause for failure to raise this claim on direct appeal as he has not demonstrated that he received ineffective assistance of counsel.

Dawson also argues that failure to consider this claim will result in a fundamental miscarriage of justice. However, he does not provide any evidence demonstrating that it is more likely than not that no reasonable juror would have convicted him if he had additional time to evaluate Spence's statement. Accordingly, because he has not shown either cause and prejudice or fundamental miscarriage of justice Dawson is procedurally barred from raising the claim that failure to

produce Spence's statement violated his right to due process of the law.

4. *Did the admission into evidence of certain uncharged bad acts violate Dawson's constitutional rights?*

Dawson claims that the State violated his rights to a fair trial and due process when Judge Ridgely permitted it to introduce evidence of certain uncharged bad acts at trial. Specifically, Dawson refers to the admission into evidence of the theft of several cars in Kent County on the morning of December 1, 1986. Dawson was never indicted on charges relating to these thefts, and the State never offered physical evidence demonstrating Dawson's presence in these cars. Therefore, Dawson claims that the evidence was more prejudicial than probative and was not supported by an appropriate evidentiary foundation.

Dawson raised this claim on direct appeal to the Delaware Supreme Court in *Dawson I.* However, he presented it as an evidentiary issue to be decided pursuant to Delaware Rule of Evidence 404(b). In ruling on the claim, the Supreme Court evaluated it as a claim grounded exclusively in state law. *See Dawson I,* 581 A.2d at 1097. As noted above, because Dawson did not present the claim to the Delaware Supreme Court as a federal claim, he failed to exhaust state remedies. *See Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (stating the established position that "exhaustion of state remedies requires that petitioner 'fairly present' federal claims to the state courts") (citation omitted). However, because Rule 61(i)(3) forecloses him from seeking postconviction remedies in the Delaware courts, he is excused from the exhaustion requirement. *See Teague v. Lane,* 489 U.S. 288, 297–98, 109 S.Ct. 1060, 1068–69, 103 L.Ed.2d 334 (1989). Thus, Dawson is barred from bringing this claim unless he can show cause and prejudice, or that failure to consider the claim will result in a fundamental miscarriage of justice.

Dawson fails to allege either cause for or prejudice resulting from his procedural default. Furthermore, there is no evidence demonstrating that failure to consider this claim will result in a fundamental miscar-

riage of justice. Accordingly, he is procedurally barred from raising the claim that the State violated his rights to a fair trial and due process when Judge Ridgely permitted it to introduce evidence of certain uncharged bad acts at trial.

5. *Did Swierzbinski's failure to object to striking jurors with moral scruples against the death penalty, and O'Donnell's failure to raise this issue on appeal constitute ineffective assistance of counsel?*

Dawson admits that on direct appeal he did not raise the claim of constitutional violations for failure to object to striking jurors with moral scruples against the death penalty during the trial and the second penalty hearing. However, he argues that he has cause for failing to raise this claim because he received ineffective assistance of counsel from both trial and appellate counsel. Dawson contends that Swierzbinski was "constitutionally ineffective by failing to object to the striking of jurors for cause by the court when they expressed doubts about the wisdom of capital punishment." He also argues that "[i]t was likewise ineffective to not raise these constitutional violations on appeal."

■ The United States Supreme Court has repeatedly held that creation of a death-qualified jury by excluding jurors with moral scruples against the death penalty does not violate a defendant's constitutional rights. *See e.g., Lockhart v. McCree*, 476 U.S. 162, 178, 106 S.Ct. 1758, 1767, 90 L.Ed.2d 137 (1986) (rejecting the view that an "impermissibly partial jury results" when the State " 'tips the scales' by excluding prospective jurors with a particular viewpoint," and reiterating that "an impartial *jury* consists of nothing more than *'jurors* who will conscientiously apply the law and find the facts' ") (citation omitted). Because Dawson's claim is foreclosed by Supreme Court precedent, Swierzbinski did not act unreasonably by failing to object to the striking of certain jurors during the trial or the second penalty hearing. Similarly, O'Donnell's decision not to raise this matter on appeal was not egregious or prejudicial. Accordingly, Dawson cannot show cause for failure to raise this

claim on direct appeal as these actions did not constitute ineffective assistance of counsel.

■ Although Dawson also argues that failure to consider this claim will result in a fundamental miscarriage of justice, he does not provide any evidence demonstrating that it is more likely than not that no reasonable juror would have sentenced him to death if the jury contained members with moral scruples against the death penalty. Accordingly, Dawson is procedurally barred from raising this claim because he has not shown either cause and prejudice or that fundamental miscarriage of justice.

6. *Did failure to object to the exclusion of jurors who did not make it clear they could never impose the death penalty, and failure to raise this issue on appeal, constitute ineffective assistance of counsel?*

Dawson admits that on direct appeal he did not raise the claim for constitutional violations by excluding jurors who did not make it clear that they could not impose the death penalty under any circumstance. However, he argues that he has cause for failing to raise it because Swierzbinski was "constitutionally ineffective by failing to object to the striking of jurors for cause by the court when they expressed doubts about the wisdom of capital punishment. It was likewise ineffective to not raise these constitutional violations on appeal."

In *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), the United States Supreme Court held that during voir dire a trial court may properly excuse a juror for cause if that juror's opposition to the death penalty "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." (quotations omitted). Dawson makes a blanket assertion in his opening brief that "several" jurors were improperly excused for cause for their death penalty views. However, he only specifically identifies one person, Ruth Marshall. During voir dire in 1993, Marshall had the following discussion with Judge Ridgely:

The Court: Do you have any religious, conscientious or other opposition to the death penalty?

Marshall: I am a member of the Society of Friends.

The Court: So the answer is yes?

Marshall: Yes.

The Court: Would your opinions, beliefs or opposition to the death penalty prevent or substantially impair the performance of your duties as a juror to decide the facts impartially in accordance with your oath?

Marshall: That has to be a yes or no?

The Court: If you can.

Marshall: I guess yes.

\*\*\*\*

The Court: Would you be able to answer the penalty hearing questions no if the evidence so warrants, regardless of your feelings about the death penalty?

Marshall: I don't know.

The Court: *Would you automatically vote that the aggravating circumstances are outweighed by the mitigating circumstances because of your beliefs about the death penalty?*

Marshall: *Yes.* (Emphasis added)

■ Marshall made it unmistakably clear that she could not sit as an impartial juror in Dawson's penalty hearing by stating that she could never vote for a sentence of death if the aggravating factors outweighed the mitigating factors. Accordingly, Judge Ridgely did not commit constitutional error by striking Marshall, and Swierzbinski acted reasonably by not objecting. Furthermore, O'Donnell's decision not to raise this issue on appeal was not egregious or prejudicial, Consequently, Dawson cannot show cause for failing to raise this claim on direct appeal because he did not receive ineffective assistance of counsel.

Additionally, Dawson has not shown that failure to consider this claim will result in a fundamental miscarriage of justice as he has not provided any evidence demonstrating that no reasonable juror would have found him eligible for the death penalty under Delaware law if Marshall had not been stricken for cause. Accordingly, Dawson is barred from raising this claim because he has not shown either cause and prejudice or fundamental miscarriage of justice.

7. *Did failure to sequester the jury violate Dawson's constitutional rights?*

Dawson does not produce any evidence or argument demonstrating either cause or prejudice for failing to raise the claim that failure to sequester the jury violated his constitutional rights. Dawson also does not provide any evidence demonstrating that failure to consider this claim will result in a fundamental miscarriage of justice. Accordingly, he is procedurally barred from raising this sequestration claim in a federal habeas proceeding.

8. *Did O'Donnell's failure to raise on appeal the claim that remarks made by prosecutors during closing arguments violated his right to a fair trial constitute ineffective assistance of counsel?*

Dawson admits that he did not raise the claim that the State violated his rights to a fair trial and due process of the law when they made prejudicial remarks during their closing arguments at trial in 1988. However, he argues that he has cause for failing to raise it because of his "counsels' ineffectiveness in failing to preserve these issues." Because Swierzbinski immediately objected to the allegedly prejudicial remarks, the court analyzes this claim to determine whether O'Donnell's failure to raise it on appeal constituted ineffective assistance of counsel.

■ In evaluating potentially improper stray remarks made by prosecutors during closing argument, a court must do so "in light of [the] closing argument as a whole." *Government of Virgin Islands v. Joseph,* 770 F.2d 343, 350 (3d Cir.1985). The court must review the entire record to determine whether the comments "so pervade the entire argument as to render the verdict a product of prejudice." *Id.* at 351.

Dawson asserts that three remarks violated his constitutional right to a fair trial. First, Dawson claims that prosecutors usurped the jury's role by expressing their own opinion of Dawson's guilt:

We don't think this was a reckless killing. We don't think it was a negligent killing.

We don't think it was a merely knowing killing. We think it was an intentional killing.

Second, Dawson claims that it was improper for the State to infer that his failure to take the stand spoke to his guilt, and to argue that the defense bore any burden of proof.

Both sides owe you the duty of giving arguments that make sense, that are supported by evidence and are not refuted by other evidence and it means something.... so we are still here and we are still asking ourselves why? Why? Why?

Third, Dawson contends that the prosecution argued for conviction based on matters irrelevant to Dawson's guilt or innocence by arguing on rebuttal that the jury should "[t]ell everyone that [Dawson] is a murderer."

The Third Circuit has held that "prejudice can be cured by an appropriate instruction by the trial judge or by a finding that there is overwhelming evidence to support the conviction." *United States v. Gallagher*, 576 F.2d 1028, 1042 (3d Cir.1978). After the prosecutor's first remark, in which he used "we" four times, the trial judge promptly instructed the jury to disregard the prosecutor's use of the first-person plural, thus removing any prejudicial taint the remark might have had.

Dawson claims that the second remark, which suggested that some sort of adverse inference could be drawn from Dawson's failure to take the stand, violates *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). In *Griffin*, the United Supreme Court held that the Fifth Amendment "forbids ... comment by the prosecution on the accused's silence." *Id.* However, because the prosecutor in his closing argument merely commented on the lack of evidence to support Dawson's theory, there was no *Griffin* violation. *See Bontempo v. Fenton*, 692 F.2d 954, 958–59 (3d Cir. 1982), *cert. denied*, 460 U.S. 1055, 103 S.Ct. 1506, 75 L.Ed.2d 935 (1983) (stating that "[q]uestions about the absence of facts in the record need not be taken as comment on defendant's failure to testify"). Furthermore, even if the jury had an impression that the remark referred to Dawson's decision not to take the stand, the trial judge cured this by instructing the jury that no adverse inference should be drawn from Dawson's decision and that the State bears the burden of proof. *See United States v. Nabors*, 762 F.2d 642, 650 (8th Cir.1985) (noting that "the instruction of the court that defendants had no 'burden or duty of calling any witnesses or producing any evidence' should have been adequate to remove any improper inferences from the minds of the jurors").

Finally, the prosecutor's remark that the jury should "[t]ell everyone that [Dawson] is a murderer," did not rise to the level of a constitutional violation. It was fully supported by the evidence, which the prosecutor meticulously detailed throughout the closing argument. *See Martin v. Foltz*, 773 F.2d 711, 717 (6th Cir.1985), *cert. denied*, 478 U.S. 1021, 106 S.Ct. 3336, 92 L.Ed.2d 741 (1986) (stating that "although an emotional appeal such as the one made by the prosecutor in this case may be improper, it was isolated in the context of the entire trial" and that a "prosecutor is permitted a certain degree of latitude in summation").

Thus, O'Donnell's failure to raise this claim on direct appeal was neither egregious nor prejudicial. Therefore, Dawson has not demonstrated cause for failing to raise this claim as he did not receive ineffective assistance of counsel. Additionally, Dawson's claim does not fall within the fundamental miscarriage of justice exception to the procedural bar rule, because he has failed to illustrate that it was more likely than not that no reasonable juror would have convicted him if the prosecutor did not make the supposedly improper remarks. Accordingly, Dawson is procedurally barred from asserting the claim that the State violated his rights to due process and a fair trial when they made prejudicial remarks during closing arguments.

9. *Did Swierzbinski's failure to object to improper remarks made by the prosecution during closing arguments at the 1993 penalty hearing, and O'Donnell's failure to raise this issue on appeal constitute ineffective assistance of counsel?*

Dawson admits that on direct appeal he did not raise the claims that the State violat-

ed his Eighth and Fourteenth Amendment rights by making arguments at the second penalty hearing in 1993 that "invited the jury to sentence him based on factors other than the aggravating characteristics of the particular offender and offense, including harm to the victim's family, the need to foster general deterrence by setting an example and otherwise appealing to the emotions and biases of the jurors." However, he argues that he has cause for failing to raise it because of his "counsel's ineffectiveness in failing to preserve these issues."

As support for his argument, Dawson cites to two remarks in particular. First, the prosecutor argued to the jury that sentencing Dawson to life imprisonment, "... would be like sending him to his room. It would be a matter of time before ... he would be transferred out of max into medium, and who knows, maybe he could even have his own cell back." Second, the prosecutor stated that at the time Mrs. Kisner was murdered, "[t]here was no lawyer to speak on [her] behalf, no judge to rule on objections, no jury to consider whether or not her aggravating circumstances outweighed her mitigating circumstances. There was only David Dawson and [Mrs .] Kisner."

█ With respect to the first remark, in which the prosecution alluded to life imprisonment as an inconsequential punishment, the prosecution directed its argument toward the escape risk Dawson posed, as evidenced by his escape from DCC on December 1, 1986. This was an appropriate argument because it addressed a specific deterrent effect of a death sentence. *See Coleman v. Brown,* 802 F.2d 1227, 1239 (10th Cir.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987) (noting that "[c]omments on the defendant's further dangerousness and the chances for rehabilitation are ... permissible."). Thus, Swierzbinski's failure to object to the first remark was reasonable, and O'Donnell's failure to raise the issue on appeal was neither egregious nor prejudicial.

The second remark alluded to Mrs. Kisner's helplessness. The Ninth Circuit has ruled that an allusion to the victims' inability to avail themselves of protections afforded to capital defendants is not improper:

Phill Skiff and Inez Skiff [the victims] didn't get due process of law. This man got a fair trial. He got two attorneys. He got resources, he got the benefit, everything that our system gives to a defendant, everything, and he got a fair trial and he will get more than that. He will get appeals, you name it, because that is our system and this system has treated him fairly. Something that he didn't do—he killed unmercifully, but our system gives him due process of law so don't think that you're killing him because you're giving him the law and you're giving him justice.

*Jeffries v. Blodgett,* 988 F.2d 923, 934 (9th Cir.1993). The Ninth Circuit reasoned that "the statement does not suggest that the jury ignore its legal responsibility impartially to weigh all of the evidence and to impose a death sentence as a matter of retribution." *Id.*

█ In *Lesko v. Lehman,* 925 F.2d 1527 (3d Cir.), *cert. denied,* 502 U.S. 898, 112 S.Ct. 273, 116 L.Ed.2d 226 (1991), the Third Circuit stated that "exhortations to show the defendant the same mercy or sympathy he showed the victim or that she had no lawyer arguing for her life are improper." In *Lesko,* the prosecutor made inflammatory remarks exhorting the jury to sentence the petitioner to death:

Right now, the score is John Lesko and Michael Travaglia two, society nothing. When will it stop? When is it going to stop? Who is going to make it stop? That's your duty.

*Id.* at 1540–41. In contrast to the *Lesko* plea for retribution, during Dawson's penalty hearing the prosecution merely commented on Mrs. Kisner's inability to avail herself of the same legal protections that the jury would afford Dawson by properly weighing aggravating and mitigating factors. Accordingly, Dawson did not receive ineffective assistance of counsel as it was reasonable for Swierzbinski not to object to these remarks, and it was not egregious or prejudicial for O'Donnell not to raise the issue on appeal.

Dawson has not demonstrated cause for failing to present the claim on direct appeal because he did not receive ineffective assis-

tance of counsel. Dawson alternatively argues that failure of the court to consider the claim that his Eighth and Fourteenth Amendment rights were violated because of the prosecutor's remarks would result in a fundamental miscarriage of justice. However, Dawson's conviction on intentional and felony murder charges established multiple statutory aggravating circumstances under Delaware law, thus making him eligible to receive the death penalty. Accordingly, Dawson has not demonstrated that no reasonable juror would have found him eligible for the death penalty under Delaware law. Dawson is therefore procedurally barred from raising this claim.

10. *Did Swierzbinski's or O'Donnell's failure to raise the claim that the death penalty, as administered in Delaware and applied to Dawson, is cruel and unusual punishment constitute ineffective assistance of counsel?*

Dawson admits that he did not raise the claim that the death penalty, as administered in Delaware and applied to him, is cruel and unusual punishment in violation of the Eighth Amendment because the State has failed "to establish sufficient safeguards to minimize the problems associated with lethal injection." However, he argues that he has cause for failing to raise it on direct appeal, because of "the ineffectiveness of Dawson's counsel."

This court has previously ruled that Delaware's death penalty statute does not violate the Eighth Amendment's bar against cruel and unusual punishment. *Deputy v. Snyder*, Civ.Act. No. 94–339–LON, mem. op. at 10–16 (D.Del. June 22, 1994), *aff'd*, 19 F.3d 1485 (3d Cir.), *cert. denied*, 512 U.S. 1230, 114 S.Ct. 2730, 129 L.Ed.2d 853 (1994). Accordingly, neither Swierzbinksi's nor O'Donnell's failure to raise an identical claim at trial, during the 1993 penalty hearing, or on appeal, was unreasonable, egregious or prejudicial. Therefore, they did not fail to render effective assistance of counsel to Dawson.

Because Dawson did not receive ineffective assistance of counsel with respect to this claim, he cannot demonstrate cause for not having raised it on direct appeal to the Delaware Supreme Court. Nor can he show that

failure to consider the claim will result in a fundamental miscarriage of justice. Accordingly, Dawson is procedurally barred from raising the claim challenging the constitutionality of the Delaware death penalty statute.

11. *Did Swierzbinski's or O'Donnell's failure to raise the claim that Delaware's lethal injection statute is preempted by federal law constitute ineffective assistance of counsel?*

Dawson admits that on direct appeal he did not raise the claim that Delaware's lethal injection statute is "preempted by federal law because it permits correctional officers to obtain federally controlled substances necessary for carrying out the execution without a prescription." However, he argues that he has cause for failing to raise it on direct appeal, because of "the ineffectiveness of Dawson's counsel."

This court has previously ruled that Delaware's death penalty statute is not preempted by federal law. *See Deputy v. Snyder*, Civ.Act. No. 94–339–LON, mem. op. at 4–10 (D.Del. June 22, 1994), *aff'd*, 19 F.3d 1485 (3d Cir.), *cert. denied*, 512 U.S. 1230, 114 S.Ct. 2730, 129 L.Ed.2d 853 (1994). Accordingly, neither Swierzbinksi's nor O'Donnell's failure to raise an identical claim at trial, during the 1993 penalty hearing, or on appeal, was unreasonable, egregious or prejudicial. Therefore, they did not fail to render effective assistance of counsel to Dawson.

Dawson cannot demonstrate cause for not having raised this claim on direct appeal because he did not receive ineffective assistance of counsel with respect to this claim. Additionally, Dawson has not shown that failure to consider the claim will result in a fundamental miscarriage of justice. Accordingly, Dawson is procedurally barred from raising this preemption claim.

12. *Did Swierzbinski's or O'Donnell's failure to raise the claim that the Delaware death penalty statute fails to adequately narrow the group of death-eligible defendants constitute ineffective assistance of counsel?*

Dawson admits that on direct appeal he did not raise the claim that the Delaware

death penalty statute violates the Eighth Amendment because it fails to adequately narrow the group of death-eligible defendants. However, he argues that he has cause for failing to raise it on direct appeal, because his counsel was ineffective in "failing to preserve this issue at trial and on appeal."

Dawson argues that because the statute allows the State to use a felony murder conviction to establish both a defendant's eligibility for death and an aggravating circumstance warranting its imposition, it "punishes non-intentional killings disproportionately more harshly than intentional killings, which do not have any automatic elements of aggravation."

The Court of Appeals for the Third Circuit has ruled that "within the context of Delaware's death penalty statute, the provision requiring the double-counting of the felony at the guilt phase and sentencing phase did not impermissibly weaken the statute's constitutionally mandated narrowing function." *Deputy v.. Taylor,* 19 F.3d 1485, 1502 (3d Cir.), *cert. denied,* 512 U.S. 1230, 114 S.Ct. 2730, 129 L.Ed.2d 853 (1994). Accordingly, neither Swierzbinksi's nor O'Donnell's failure to raise an identical claim at trial, during the 1993 penalty hearing, or on appeal, was unreasonable, egregious or prejudicial. Therefore, they did not fail to render effective assistance of counsel to Dawson.

Because Dawson did not receive ineffective assistance of counsel with respect to this claim, he cannot demonstrate cause for not having raised it on direct appeal. Additionally, he has not shown that failure to consider the claim will result in a fundamental miscarriage of justice. Consequently, Dawson is procedurally barred from raising the claim that the Delaware death penalty statute violates the Eighth Amendment because it fails to adequately narrow the group of death-eligible defendants.

13. *Did Swierzbinski's failure to interview witnesses and obtain certain evidence at the 1993 penalty hearing constitute ineffective assistance of counsel?*

Dawson also asserts a claim for ineffective assistance of counsel based on Swierzbinski's performance during the 1993 penalty hearing. In Dawson's amended petition, he claims that at the 1993 penalty hearing Swierzbinski violated his Sixth Amendment right to effective assistance of counsel by "fail[ing] to interview any witnesses with any eye toward demonstrating that some of the evidence put on by the State in the 1988 trial was, in fact, false; thereby creating residual doubt as to Dawson's guilt and mitigating Dawson's role in the offense." More specifically, Dawson alleges that Swierzbinski did not interview Kathleen Spence or the other three escapees to "determin[e] whether or not the version of facts presented by the State in 1988 was true."

In his state postconviction motion Dawson specifically argued that Swierzbinski failed to call Kathleen Spence and Wilbert Dill, the service station operator, to testify, he failed to play Spence's taped statement, and he also failed to introduce a report showing that Spence had testified falsely. More generally, Dawson alleged that Swierzbinski failed to prepare adequately for the penalty hearing, failed to adequately prepare and present a defense to the aggravating circumstances prong, and failed to develop or present mitigating evidence. Dawson never alleged that Swierzbinski was ineffective in failing to interview Kathleen Spence or the other three escapees.

Dawson has neither alleged cause or prejudice, nor has he illustrated that failure by this court to consider this claim will result in a fundamental miscarriage of justice. Accordingly, Dawson is barred from asserting the claim that he had ineffective assistance of counsel at the 1993 penalty hearing.

B. *Clearly Established Federal Law*

Dawson asserts several additional claims for which he exhausted state remedies, the determination of which did not rest on independent and adequate state grounds. In *Coleman v. Thompson,* 501 U.S. 722, 735, 111 S.Ct. 2546, 2557, 115 L.Ed.2d 640 (1991), the Supreme Court stated that when considering a habeas petition, "if the decision of the last state court to which the petitioner presented his federal claims ... did not clearly and expressly rely on an independent and adequate state ground, a federal court may

address the petition." Accordingly, the procedural bar analysis does not apply, and the court may review these claims on their merits.

Section 2254(d) provides that when evaluating a claim on the merits, a district court must rule against the petitioner unless he can demonstrate that the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Accordingly, the court must determine either whether the state courts decided Dawson's habeas claims on the basis of "clearly established law" and whether the determinations were "contrary to, or involved an unreasonable application of" that law, or whether the decision was based on an "unreasonable determination of the facts."

Dawson asserts the following seven claims which the court may review on the merits. First, Dawson claims that pretrial publicity and hostility toward him in Kent County prevented the impaneling of an impartial jury in Kent County, thereby violating his right to a fair trial. Second, Dawson claims that the trial court violated his Sixth and Fourteenth Amendment rights to an impartial jury during jury selection. Third, Dawson claims that several omissions by Swierzbinski during the trial violated his Sixth Amendment right to effective assistance of counsel. Fourth, Dawson claims that the exclusion for cause of certain jurors against the death penalty during the 1993 penalty hearing violated his Sixth and Fourteenth Amendment rights. Fifth, Dawson claims that during the 1993 penalty hearing the prosecution's disclosure to the jury that a prior jury sentenced him to death violated his rights to a fair penalty hearing and to due process of the law. Sixth, Dawson claims that the Delaware death penalty statute is unconstitutional. Seventh, Dawson claims

that the retroactive application of the revised death penalty statute violated the Ex Post Facto Clause.

1. *Was Dawson's right to a fair trial violated because pretrial publicity and hostility toward him prevented the impaneling of an impartial jury?*

Dawson claims that the trial court's denial of his motion for a change of venue violated his right to a fair trial because the pretrial publicity about the case, and hostility toward him in Kent County, made it impossible for him to have an impartial jury in that venue. Dawson presented this claim to the Delaware Supreme Court, thereby exhausting his state remedies. *See Dawson I,* 581 A.2d at 1088–91.

■ To successfully claim denial of a fair trial due to prejudicial media coverage Dawson must demonstrate that the factual circumstances of the case require the application of a presumption of prejudice. *See Mu'Min v. Virginia,* 500 U.S. 415, 429–30, 111 S.Ct. 1899, 1907–08, 114 L.Ed.2d 493 (1991) (discussing presumption of prejudice). *See also Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) (stating that to "hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard").

■ The Third Circuit has stated that finding a presumption of prejudice is "exceedingly rare" and only arises if " 'the community and media . . . reaction [was] so hostile and so pervasive as to make it apparent that even the most careful *voir dire* process [was] unable to assure an impartial jury.' " *Flamer v. Delaware,* 68 F.3d 736, 754 (3d Cir.1995) (quoting *Rock v. Zimmerman,* 959 F.2d 1237, 1252–53 (3d Cir.), *cert. denied,* 505 U.S. 1222, 112 S.Ct. 3036, 120 L.Ed.2d 905 (1992)). Swierzbinski moved for a change of venue from Kent County to New Castle County just prior to jury selection for the trial. He argued that the news coverage of Dawson's case was so prejudicial and sensational that Dawson would be unable to receive a fair trial in Kent County. In the

days immediately following December 1, 1986, television stations serving Kent County broadcast several stories about Dawson's escape and Mrs. Kisner's murder. Additionally, local newspapers published several articles about the escape and the murder. Of the twelve jurors and four alternates selected, six did not recall any publicity involving the case, nine recalled limited publicity immediately following the murder, and only one, Buel Parrish, had read anything about the case in the days preceding the jury selection process.

Judge Ridgely reviewed news accounts submitted to him by Swierzbinski, and concluded that the stories "were largely informational in scope and insufficient to give rise to a presumption of prejudice in the venire panel which had been summoned for jury duty." *Dawson I*, 581 A.2d at 1088–89. The Delaware Supreme Court affirmed. *See id.* The trial court's determination that pretrial media publicity was not prejudicial is a finding of fact. *See Patton v. Yount*, 467 U.S. 1025, 1036–38 & n. 12, 104 S.Ct. 2885, 2891–92 & n. 12, 81 L.Ed.2d 847 (1984) (stating that the question of "whether jurors have opinions that disqualify them" is a question of fact). Thus, under § 2254(e)(1) this finding is presumed correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Furthermore, Judge Ridgely presided over voir dire to ensure the selection of an impartial jury. Voir dire took place over the course of four days, and consisted of individualized questioning of 130 persons from two separate panels. Each juror selected represented to Judge Ridgely that he or she had not formed an opinion about Dawson's guilt or innocence, was not biased against Dawson, and could render an impartial verdict based solely on the evidence. After the conclusion of jury selection, Judge Ridgely stated, "I am satisfied that a fair and impartial jury has been selected."

Dawson does not present any evidence demonstrating that Judge Ridgely incorrectly determined that news coverage of Dawson's case was largely informational and was not prejudicial, and that an impartial jury was selected. Dawson also does not demon-

strate that an overwhelmingly negative public reaction prevented the impanelling of an impartial jury. Thus, Dawson has not rebutted this factual finding by clear and convincing evidence, and therefore there is no presumption of prejudice. Accordingly, the state courts neither violated clearly established law, nor made an unreasonable determination of the facts, by denying Dawson's motion for a change of venue because the pretrial publicity about the case, and hostility toward him in Kent County, made it impossible for him to have an impartial jury. Therefore, this claim fails on the merits.

2. *Did the trial court violate Dawson's rights to an impartial jury?*

Dawson alleges that the trial court violated his Sixth and Fourteenth Amendment rights to an impartial jury. First, Dawson argues that Judge Ridgely's failure to excuse certain jurors for cause required Dawson to use eight of his twenty allotted peremptory challenges, thereby preventing him from removing biased jurors from the panel. Second, Judge Ridgely erred by failing to excuse for cause two jurors, Buel Parrish and Francis Angel. Third, Judge Ridgely erred by failing to award two additional peremptory challenges to be used for the purpose of striking Parrish and Angel. Dawson presented these claims to the Delaware Supreme Court, thereby exhausting his state remedies. *See Dawson I*, 581 A.2d at 1093–97.

The United States Supreme Court holds that "[s]o long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988) (citations omitted). Accordingly, Judge Ridgely did not violate clearly established federal law simply because Dawson had to use eight peremptory challenges to strike jurors not excused for cause.

Dawson also claims that Judge Ridgely erred in failing to excuse for cause Parrish and Angel. Judge Ridgely denied motions to excuse both jurors for cause, concluding that both jurors could be impartial after questioning them regarding their abili-

ty to act as impartial jurors. The Delaware Supreme Court affirmed this finding. *See Dawson I*, 581 A.2d at 1093–95. This is a finding of fact presumed to be correct under § 2254(e)(1) unless Dawson rebuts this presumption by clear and convincing evidence. Dawson does not present any evidence to demonstrate that Judge Ridgely incorrectly found these two jurors to be impartial. Accordingly, this finding was not based on an unreasonable application of the facts, and this claim fails on its merits.

 Dawson claims that Judge Ridgely should have awarded him two additional peremptory challenges to be used to strike Parrish and Angel. The United States Supreme Court has stated that:

> [b]ecause peremptory challenges are a creature of statute and are not required by the Constitution, it is for the State to determine ... their purpose and the manner of their exercise. As such, the "right" to peremptory challenges is "denied or impaired" only if the defendant does not receive that which state law provides.

*Id.* at 89, 108 S.Ct. at 2278 (internal citations omitted). Delaware Superior Court Criminal Rule 24(b)(1) provides that "[i]n capital cases, the state shall be entitled to 12 peremptory challenges and the defendant or defendants shall be entitled to a total of 20 peremptory challenges." Judge Ridgely complied with Delaware law and allotted Dawson twenty peremptory challenges. Accordingly, Judge Ridgely did not violate clearly established federal law by not providing Dawson with two additional peremptory challenges. Therefore, Dawson's claim that the trial court violated his Sixth and Fourteenth Amendment rights to an impartial jury fails on the merits.

### 3. Did Dawson receive ineffective assistance of counsel at trial?

Dawson claims that Swierzbinski and earlier assigned counsel violated his Sixth Amendment right to effective assistance of counsel in five ways. First, Swierzbinski and other counsel failed to adequately determine and develop Dawson's version of the facts. Second, Swierzbinski failed to adequately investigate the relevant facts and interview

relevant witnesses. Third, Swierzbinski and other counsel did not adequately use certain means of discovering exculpatory evidence available to the State. Fourth, Swierzbinski did not adequately consult with Dawson about his right to testify during the trial. Fifth, Swierzbinski performed deficiently at trial. Dawson presented all five of these claims to the Delaware Supreme Court, thereby exhausting state remedies. *See Dawson IV*, 673 A.2d at 1190–93.

The United States Supreme Court stated in *Strickland* that to prevail on an ineffective assistance of counsel claim, a petitioner must demonstrate that counsel's performance fell below an "objective standard of reasonableness," and that counsel's performance caused prejudice. *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984).

 The *Strickland* analysis for an ineffective assistance of counsel claim is clearly established law. However, the determination of whether Dawson received ineffective assistance of counsel is a mixed question of law and fact. *See id.* at 698, 104 S.Ct. at 2070. Therefore, this court must analyze whether "an unreasonable application" of clearly established federal law resulted in the Delaware Supreme Court's denial of these claims. *See* 28 U.S.C. § 2254(d)(1). This court must decide whether the Delaware Supreme Court unreasonably applied *Strickland* to Dawson's claims that various omissions by Swierzbinski and other counsel constituted ineffective assistance of counsel.

a. *Did Swierzbinski and previously appointed counsel fail to adequately determine and develop Dawson's version of the facts?*

Dawson claims that Swierzbinski failed to adequately determine and develop his version of the facts prior to trial. Dawson specifically alleges that Swierzbinski and previously appointed counsel were deficient in two ways. First, from the time of his arrest on December 2, 1986, until November 1987, Dawson met with his court-appointed attorneys only once, prior to his preliminary hearing on December 5, 1986. Second, Swierz-

binski waited until April 1988 to discuss Dawson's version of the facts with him.

Dawson's case did not go to trial until June 1988. When Swierzbinski met with Dawson in April 1988, Dawson told Swierzbinski that shortly after escaping he split off from Nave, McCoy and Irwin, and that he burglarized the Kisner residence alone. These statements contradicted those Dawson made to DCC corrections officers shortly after his December 1986 arrest. Additionally, the kidnaping trial of Nave, McCoy, and Irwin occurred during the summer of 1987, and testimony during this trial indicated that they separated from Dawson shortly after their escape.

■ Dawson has failed to demonstrate that Swierzbinski and his predecessors would have discovered any favorable evidence if they had met with Dawson at a time closer to his arrest. Furthermore, Dawson has not presented any evidence demonstrating that it was either unreasonable or prejudicial for counsel not to consult with him at an earlier date. Accordingly, the Delaware state courts' rejection of the claim that failure to adequately determine and develop Dawson's version of the facts prior to trial was not an unreasonable application of clearly established federal law, and was not based on an unreasonable application of the facts. Therefore, his claim fails on the merits.

b. *Did Swierzbinski fail to adequately investigate the relevant facts and interview relevant witnesses?*

Dawson claims that Swierzbinski provided ineffective assistance of counsel because prior to trial he failed to adequately investigate the relevant facts and interview relevant witnesses.

■ As noted above, the evidence overwhelmingly supports the conclusion that Dawson separated from Nave, McCoy, and Irwin, on the morning of December 1, 1986, and acted alone in entering the Kisner residence and murdering Mrs. Kisner. Thus, Dawson has failed to demonstrate that Swierzbinski and his predecessors would have uncovered any favorable evidence if they had conducted certain investigations and inter-

viewed certain unspecified witnesses. *See Lawrence v. Armontrout,* 961 F.2d 113, 115 (8th Cir.1992) (stating that it is a defendant's "burden to affirmatively prove that there is a reasonable probability that, had his trial counsel interviewed and called the alibi witnesses, he would have been acquitted") (citing *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068). *See also Schwander v. Blackburn,* 750 F.2d 494, 500 (5th Cir.1985) (stating that "[d]efense counsel is not required 'to investigate everyone whose name happens to be mentioned by the defendant' ") (citation omitted). Therefore, Dawson has not illustrated that failure to further investigate the facts and interview witnesses constituted ineffective assistance of counsel, as Dawson presents no evidence demonstrating that this decision was either unreasonable or prejudicial. Accordingly, the Delaware state courts' rejection of this claim was not an unreasonable application of clearly established federal law, and was not based on an unreasonable application of the facts. Therefore, this claim fails on the merits.

c. *Did Swierzbinski and previously appointed counsel fail to adequately use available means of discovering exculpatory evidence available to the State or to discover the State's case?*

Dawson claims that Swierzbinski and earlier assigned counsel failed to fully use available discovery methods to uncover exculpatory evidence. Dawson specifically alleges that counsel was deficient in failing to request an examination of the knives found on Nave, McCoy, and Irwin, until two weeks prior to trial.

■ As noted above, Swierzbinski's failure to obtain the knives did not prejudice the outcome of Dawson's trial. There is no indication that those knives were stolen from either the Kisner or Seeney residences. Rather, the evidence suggests that Nave, McCoy and Irwin obtained the knives during their crime spree outside of Delaware. Additionally, during an evidentiary hearing Judge Ridgely specifically credited Swierzbinski's testimony that Dawson informed him that he left the other three escapees shortly after the escape and acted alone in burglarizing the

Kisner residence. Pursuant to § 2254(e)(1), this finding is presumed correct unless Dawson rebuts it by clear and convincing evidence. Dawson has neither presented evidence demonstrating that failure to obtain the knives prejudiced the trial, nor has he offered evidence to rebut Swierzbinski's testimony by clear and convincing evidence. Therefore, Dawson offers no evidence showing that counsel's failure to request an examination of the knives was either unreasonable or prejudicial. Accordingly, the Delaware Supreme Court did not unreasonably apply clearly established federal law, and did not base its decision on an unreasonable application of the facts. Therefore, this claim fails on the merits.

### d. Did Swierzbinski fail to adequately consult with Dawson regarding his right to testify at trial?

Dawson claims that Swierzbinski provided ineffective assistance of counsel by failing to adequately consult with him regarding his right to testify at trial.

Judge Ridgely evaluated an affidavit submitted by Swierzbinski during Dawson's state postconviction proceedings, specifically crediting Swierzbinski's account of what transpired during his conversations with Dawson. Judge Ridgely stated:

> The Court accepts the affidavit of defense counsel to the effect that he discussed with Dawson his choice of testifying or not testifying on several occasions. Counsel sent Dawson a letter detailing what was involved in his choice of whether or not to testify. Further, Dawson signed an affidavit stating that he understood counsel's letter and that he did not wish to testify at trial, however, 'if I change my mind at any time, I agree to tell my lawyers immediately.'

*Dawson III*, 681 A.2d at 422–23.

■■■ Pursuant to § 2254(e)(1), this finding is presumed correct unless Dawson rebuts it by clear and convincing evidence. Dawson has neither presented evidence demonstrating that Swierzbinski failed to adequately consult with Dawson regarding his right to testify, nor has he offered evidence to rebut Swierzbinski's testimony by clear and con-

vincing evidence. Therefore, Dawson offers no evidence showing that counsel was either unreasonable or prejudicial in discussing Dawson's right to testify at trial. Accordingly, the Delaware Supreme Court did not unreasonably apply clearly established federal law in rejecting this claim, and did not base its decision on an unreasonable application of the facts. Therefore, this claim fails on the merits.

### e. Did Swierzbinski perform deficiently at trial?

Dawson claims that Swierzbinski performed deficiently at trial for four reasons. First, Swierzbinski permitted the jury to hear evidence of Dawson's criminal background. Second, Swierzbinski failed to offer into evidence the December 1986 statement Dawson made to DCC corrections officers after referring to the statement in his opening argument. Third, Swierzbinski prejudiced Dawson during the cross-examination of Brian Kisner. Fourth, Swierzbinski did not have a unified theory for defending Dawson.

### i. Did Dawson receive ineffective assistance of counsel when the jury hear evidence of his criminal background?

■■■ Dawson argues that Swierzbinski's failure to sever Count Fifteen of the indictment, the count charging Dawson with possession of a deadly weapon by a person prohibited, unnecessarily allowed the State to present evidence of Dawson's criminal background. Even if the Superior Court severed Count Fifteen, the jury still would have heard evidence from the prosecution regarding Dawson's past crimes because Count Thirteen of the indictment charged Dawson with killing Mrs. Kisner in furtherance of escape after conviction. Therefore, the jury knew that Dawson was incarcerated for prior crimes. Accordingly, Swierzbinski did not provide unreasonable assistance of counsel in declining to move for a severance of Count Fifteen. Therefore, the Delaware Supreme Court did not unreasonably apply clearly established federal law in rejecting this claim, and this claim fails on the merits.

ii. *Did Dawson receive ineffective assistance of counsel when Swierzbinski failed to admit into evidence the December 1986 statement?*

Dawson also argues that he was prejudiced during Swierzbinski's opening statement because Swierzbinski referred to the statement Dawson gave to DCC correction officers on or around December 9, 1986, without ever offering the statement into evidence. In that statement Dawson alleged that he never split off from Nave, McCoy, and Irwin, and that the other three escapees killed Mrs. Kisner.

In an affidavit submitted to the Superior Court during Dawson's state postconviction proceedings, Swierzbinski stated that he alluded to Dawson's December 1986 statement as a preemptive measure because he believed that the State would seek to admit it into evidence. Swierzbinski formed this belief after the State opposed his motion to suppress the statement. Judge Ridgely accepted Swierzbinski's account. & *See Dawson III*, 681 A.2d at 423. Pursuant to § 2254(e)(1), this finding is presumed correct unless Dawson rebuts it by clear and convincing evidence. Dawson has neither presented evidence demonstrating that Swierzbinski's failure to offer the statement into evidence prejudiced him, nor has he offered evidence to rebut Swierzbinski's testimony by clear and convincing evidence. Therefore, Dawson offers no evidence showing that counsel was either unreasonable or prejudicial in failing to offer the December 1986 statement into evidence after referring to it in opening argument. Accordingly, the Delaware Supreme Court did not unreasonably apply clearly established federal law in rejecting this claim, and did not base its decision on an unreasonable application of the facts. Therefore, this claim fails on the merits.

iii. *Did Dawson receive ineffective assistance of counsel when Swierzbinski cross-examined Brian Kisner?*

Dawson argues that he was prejudiced by Swierzbinski's cross-examination of Brian Kisner, in which Swierzbinski suggested that Brian was somehow responsible for his mother's death.

During state postconviction proceedings, Swierzbinski stated that he did not believe Brian was completely truthful about circumstances concerning the discovery of his mother's body. Judge Ridgely stated that he accepted "trial counsel's explanation that he believed he had a duty to Dawson to explore Brian's story carefully." *Dawson III*, 681 A.2d at 423. Pursuant to § 2254(e)(1), this finding is presumed correct unless Dawson rebuts it by clear and convincing evidence. Dawson has neither presented evidence demonstrating that Swierzbinski's cross-examination of Brian prejudiced him, nor has he offered evidence to rebut Swierzbinski's testimony by clear and convincing evidence. Therefore, Dawson offers no evidence showing that counsel was either unreasonable or prejudicial in cross-examining Brian Kisner. Accordingly, the Delaware Supreme Court did not unreasonably apply clearly established federal law in rejecting this claim, and did not base its decision on an unreasonable application of the facts. Therefore, this claim fails on the merits.

iv. *Did Dawson receive ineffective assistance of counsel because Swierzbinski failed to have a unified theory of defense?*

Dawson claims that Swierzbinski did not have a unified theory for defending the case.

The Third Circuit recognizes that "a defense attorney's performance need not be based on some grand overarching theory in order to meet constitutional requirements." *Flamer v. Delaware*, 68 F.3d 710, 729 (3d Cir.1995), *cert. denied*, 516 U.S. 1088, 116 S.Ct. 807, 133 L.Ed.2d 754 (1996). Furthermore, even if a defense attorney "did not have a single 'unified' theory, it does not necessarily follow that his performance was deficient." *Id.* Swierzbinski stated in an affidavit that he "relied in part on the defense of reasonable doubt," an accepted criminal defense strategy. Moreover, Dawson does not present any evidence suggesting that another defense would have been more effective, and he has not shown that counsel was either unreasonable or prejudicial in defending him. Accordingly, the Delaware Supreme Court did not unreasonably apply clearly estab-

lished federal law in rejecting this claim, and did not base its decision on an unreasonable application of the facts. Therefore, this claim fails on the merits.

4. *Did the exclusion for cause of prospective jurors with moral scruples against the death penalty violate Dawson's right to have his sentence determined by jurors representing a fair cross-section of the community?*

Dawson claims that at the 1993 penalty hearing, the exclusion for cause of certain jurors with moral scruples against the death penalty violated his Sixth and Fourteenth Amendment rights to have his sentence determined by jurors representing a fair cross-section of the community. Dawson presented this claim to the Delaware Supreme Court, and has thus exhausted state remedies. *See Dawson II,* 637 A.2d at 61.

■ In *Lockhart v. McCree,* 476 U.S. 162, 177, 106 S.Ct. 1758, 1767, 90 L.Ed.2d 137 (1986), the United States Supreme Court held that death-qualifying a jury does not violate the Constitution's fair-cross-section requirement. Accordingly, the exclusion for cause of certain jurors with moral scruples against the death penalty did not violate Dawson's Sixth and Fourteenth Amendment rights. Therefore, the Delaware state courts' rejection of this claim was not contrary to clearly established federal law, and this claim fails on the merits.

5. *Did the State violate Dawson's rights to a fair penalty hearing and to due process of the law by disclosing to the jury that a death sentence was previously imposed on him?*

Dawson claims that the State violated his rights to a fair penalty hearing in 1993 and to due process of the law by disclosing to the jury that a death sentence was previously imposed on him. Dawson presented this claim to the Delaware Supreme Court, and has thus exhausted state remedies. *See Dawson II,* 637 A.2d at 61–62.

In *Arizona v. Washington,* 434 U.S. 497, 514, 98 S.Ct. 824, 834, 54 L.Ed.2d 717 (1978), the United States Supreme Court held that "a trial judge's decision to declare a mistrial based on his assessment of the prejudicial impact of improper argument is entitled to great deference." Furthermore, a mistrial should only be declared upon a showing of "manifest necessity." *Id.* at 505, 98 S.Ct. at 830.

■ After the prosecution rested its case-in-chief during the 1993 penalty hearing, the defense called a records supervisor at DCC, Cathy Guessford, to testify about Dawson's institutional record. On cross-examination, the State questioned Guessford about a notation in Dawson's's record concerning "the problem" identified by prison social workers. Guessford replied, "death sentence and escape risk." Swierzbinski immediately objected and moved for a mistrial, arguing that Guessford's testimony was prejudicial because it informed the jury that a previous jury sentenced Dawson to death on the four counts of first degree murder. Judge Ridgely denied the motion, stating that the jury would most likely infer that Guessford was testifying about the possibility of receiving a death sentence, rather than concluding that one had been previously imposed. However, Judge Ridgely stated that he would read a limiting instruction to the jury to remove any prejudice Guessford's testimony may have caused.

Swierzbinski renewed his motion for a mistrial. The prosecution noted that the particular record from which Guessford read the phrase "death sentence" had been created after Dawson's original death sentence was vacated by the United States Supreme Court. Consequently, the phrase could only be construed to mean the possibility that a death sentence might be imposed. Judge Ridgely again denied the motion for a mistrial. Judge Ridgely then instructed the jury as follows:

Members of the jury, the fact that a defendant faces a potential death sentence to be determined by the Court is not, in and of itself, either an aggravating circumstance nor a mitigating circumstance to be considered by the jury. The last testimony of this witness is stricken. You are to disregard it.

*See Arizona,* 434 U.S. at 512–13, 98 S.Ct. at 833–34 (noting that it is appropriate for a trial judge to "instruct the jury to disregard the improper comment").

On appeal, the Delaware Supreme Court affirmed Judge Ridgely's finding that the jury would most likely believe that Guessford was referring to a possible death sentence. *See Dawson II,* 637 A.2d at 62. This finding is presumptively correct unless Dawson can rebut it by clear and convincing evidence. Dawson does not offer any evidence to demonstrate that Judge Ridgely erred in this conclusion. Accordingly, the State did not violate Dawson's rights to a fair penalty hearing and to due process of the law by disclosing to the jury that a previous jury sentenced Dawson to death. Accordingly, the Delaware Supreme Court's rejection of this claim was not contrary to clearly established federal law, and did not rely on an unreasonable application of the facts. Therefore, this claim fails on the merits.

6. *Does Delaware's death penalty statute result in a pattern and practice of arbitrary and capricious capital sentencing?*

Dawson claims that the Delaware death penalty statute is unconstitutional because it fails to provide the sentencing judge with any standards as to how he or she is to be guided by the jury's advisory verdict. Dawson presented this claim to the Delaware Supreme Court, and has thus exhausted state remedies. *See Dawson II,* 637 A.2d at 67.

In *Harris v. Alabama,* 513 U.S. 504, 512, 115 S.Ct. 1031, 1036, 130 L.Ed.2d 1004 (1995), the United States Supreme Court held "that the Eighth Amendment does not require the State to define the weight the sentencing judge must accord to an advisory jury verdict." Accordingly, the Delaware Supreme Court did not act contrary to clearly established federal law in rejecting Dawson's claim that Delaware's death penalty statute is unconstitutional, and this claim fails on the merits.

7. *Did the retroactive application of Delaware's revised death penalty statute violate the Ex Post Facto Clause?*

Dawson claims that the State of Delaware violated the Constitution's Ex Post Facto Clause by retroactively applying the terms of Delaware's revised death penalty statute to crimes committed five years before it was enacted in 1991. Dawson presented this claim to the Delaware Supreme Court, and has therefore exhausted state remedies.

*See Dawson II,* 637 A.2d at 60–61.

The United States Supreme Court ruled in *Gregg v. Georgia,* 428 U.S. 153, 207, 96 S.Ct. 2909, 2941, 49 L.Ed.2d 859 (1976), that Georgia's death penalty statute was constitutional. The Delaware state legislature subsequently enacted a similar capital punishment regime, codified at 11 *Del.C.* § 4209. Dawson's original death sentence was imposed pursuant to this statute. Under this statute, the jury was given sentencing authority. It could sentence a defendant to death provided that it found, by a unanimous vote, at least one statutory aggravating circumstance beyond a reasonable doubt, and that it recommended a death sentence after weighing aggravating and mitigating evidence. The statute did not require the jury to impose a sentence of death if the aggravating factors outweighed the mitigating factors.

In October 1991, the Delaware legislature amended the death penalty statute. The amended statute was signed into law on November 4, 1991. The Delaware Supreme Court later observed that the amending legislation shifted sentencing authority from the jury to the judge:

Under Delaware law, as revised in 1991, a sentence of death may be imposed only under the bifurcated procedure prescribed by 11 *Del.C.* § 4209. That statute requires the jury to determine, during the penalty phase, 1) whether the evidence shows beyond a reasonable doubt the existence of at least one statutory aggravating circumstance and 2) whether, by a preponderance of the evidence, the aggravating circumstances outweigh any mitigating circumstances found to exist. 11 *Del.C.* § 4209(c). The trial court, after considering the recommendation of the jury, is to decide the same questions.

If the court concludes that the answer to both questions is in the affirmative, it must

impose a sentence of death; otherwise, it must impose a sentence of life imprisonment without the possibility of probation, parole, or other reduction in sentence. 11 *Del.C.* § 4209(d). Thus, the Superior Court bears the ultimate responsibility for imposition of the death sentence while the jury acts in an advisory capacity as the conscience of the community.

*Wright v. State,* 633 A.2d 329, 335 (Del.1993) (quotations omitted). Contrary to the original statute, in which the jury had discretion to impose life imprisonment without parole if the aggravating factors outweighed mitigating factors, under the revised statute the judge is required to impose a sentence of death under such a circumstance.

Section 6 of the 1991 amending legislation provides that all defendants tried or sentenced after the effective date of the Act are subject to the new sentencing provisions. Accordingly, after Dawson's original death sentence was vacated by the United States Supreme Court in 1992, his 1993 penalty hearing was conducted pursuant to the terms of the revised death penalty statute.

Dawson claims that the State of Delaware violated the Ex Post Facto Clause by subjecting him to the revised sentencing procedures embodied in the amended legislation, as a jury convicted him for crimes committed approximately five years before the amended statute's effective date. Dawson argues that the requirement that the judge must sentence him to death if aggravating factors outweigh mitigating factors by a preponderance of the evidence constitutes a retroactive enhancement of the punishment he originally faced. *See Collins v. Youngblood,* 497 U.S. 37, 41–44, 110 S.Ct. 2715, 2718–19, 111 L.Ed.2d 30 (1990) (stating that "the constitutional prohibition on ex post facto laws applies only to penal statutes which disadvantage the offender affected by them").

In *Dobbert v. Florida,* 432 U.S. 282, 293, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977), the United States Supreme Court held that "[e]ven though it may work to the disadvantage of a defendant, a procedural change is not ex post facto." This court has ruled that the revised Delaware statute does not violate the Ex Post Facto Clause because

its modifications are procedural in nature. *See Ferguson v. Delaware,* C.A. No. 96–306–LON, mem. op. at 11–24 (D.Del. Dec. 13, 1996) (stating that the revised statute "simply alters the procedures for deciding among the same penalty options," life imprisonment or death). Although under the current scheme a judge is required to sentence a defendant to death if the aggravating factors outweigh the mitigating factors by a preponderance of the evidence, the statute itself does not mandate an automatic sentence of death for the crimes of first degree or felony murder. Thus, even if there is a hypothetical chance that a defendant is more likely to be sentenced to death under the revised Delaware scheme, that factor alone does not violate the Ex Post Facto Clause, because the changes are merely procedural. Accordingly, the Delaware Supreme Court did not act contrary to clearly established federal law when it rejected Dawson's claim that retroactive application of the revised death penalty statute violated the Ex Post Facto Clause.

### C. *Other Claims*

Dawson asserts two claims for which he exhausted state remedies, but which do not fall under the ineffective assistance of counsel analysis, and are not evaluated on the merits. First, Dawson claims that jury instructions during the second penalty hearing in 1993 violated his Sixth Amendment right to a fair penalty hearing. Second, Dawson asserts that Judge Ridgely's limitation of certain rights during postconviction proceedings violated his right to due process of the law.

1. *Did the Superior Court violate Dawson's Sixth Amendment right by improperly instructing the jury during the second penalty hearing, in 1993?*

Dawson claims that the Superior Court improperly instructed the jury during the 1993 penalty hearing, thereby violating his Sixth Amendment right to a fair penalty hearing. First, Dawson claims that "the jury was not adequately instructed as to the State's burden of proof with respect to nonstatutory aggravating evidence." Second, he

claims that "the instructions could have mis-lead the jury to believe that mitigating circumstances must be established by the defense beyond a reasonable doubt."

At the conclusion of the penalty hearing, Judge Ridgely instructed the jury as follows:

> After you consider whether the evidence shows beyond a reasonable doubt that one or more of the alleged statutory aggravating circumstances exists, you must also weigh and consider the mitigating circumstances and the aggravating circumstances, including but not limited to the statutory aggravating circumstances that you may have already found to exist.
>
> \*\*\*\*
>
> You must then determine whether, based upon a preponderance of the evidence, the aggravating factors outweigh the mitigating factors. The side on which the greater weight of evidence is found is the side on which the preponderance of the evidence exists.

Swierzbinski did not object to the jury instruction at the Penalty hearing. O'Donnell objected to the instruction on appeal to the Delaware Supreme Court, thereby satisfying exhaustion requirements. The Delaware Supreme Court limited its review of the instruction to a plain error standard pursuant to Supreme Court Rule 8. Rule 8 provides that "[o]nly questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the Court may consider and determine any question not so presented." The plain error standard states:

> Under the plain error standard of review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process. Furthermore the doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice.

*Wainwright v. State,* 504 A.2d 1096, 1100 (Del.), *cert. denied,* 479 U.S. 869, 107 S.Ct.

236, 93 L.Ed.2d 161 (1986) (citations omitted).

Federal habeas review of a claim is generally precluded where the decision of the last state court to which a petitioner presented his federal claim contains "a plain statement" that the court's decision rests on independent and adequate state grounds. *See Coleman v. Thompson,* 501 U.S. 722, 729–30, 111 S.Ct. 2546, 2553, 115 L.Ed.2d 640 (1991). Because the Delaware Supreme Court reviewed petitioner's jury instruction claims under a plain error standard pursuant to Rule 8, this court must consider whether the Supreme Court's decision rests on an independent and adequate state ground that would bar the court from reviewing petitioner's claim. If it rests on independent and adequate state grounds, then Dawson is barred from bringing this claim unless he demonstrates cause and prejudice or fundamental miscarriage of justice. If it does not rest on independent and adequate state grounds, the court may review the claim pursuant to the provisions of § 2254(d).

a. *Did the aggravating circumstances instruction violate Dawson's Sixth Amendment right?*

■ The Delaware Supreme Court grounded its plain error review of the non-statutory aggravating factors instruction solely in Delaware law. *See Dawson II,* 637 A.2d at 64. Accordingly, this decision rests on independent and adequate state grounds, and Dawson is procedurally barred from raising this claim in a federal habeas action unless he can demonstrate either cause and prejudice, or that failure to consider the claim will result in a fundamental miscarriage of justice. Because Dawson has not presented any evidence demonstrating either cause and prejudice or fundamental miscarriage of justice, he is barred from bringing the claim that the Superior Court's improper aggravating circumstances jury instruction during the 1993 penalty hearing violated his Sixth Amendment right.

b. *Did the mitigating circumstances instruction violate Dawson's Sixth Amendment right?*

■ The Delaware Supreme Court relied on both Delaware law and federal law to

conclude that the trial court had not committed plain error in instructing the jury regarding mitigating facts, stating that "[t]he unambiguous jury instructions in the case sub judice were completely consistent with the requirements of both the United States Constitution and the Delaware death penalty statute." *See Dawson II,* 637 A.2d at 65. *See also Roy v. Coxon,* 907 F.2d 385, 391 (2d Cir.1990) (finding that state supreme court's decision that the trial court had not committed plain error was not independent of federal constitutional law where state court relied on a decision of United States Supreme Court). Therefore, the decision is not sufficiently independent of federal law to preclude federal habeas review by this court. Because the Delaware Supreme Court reviewed petitioner's jury instruction claim under a plain error standard, however, the court's consideration of this claim is likewise limited to a plain error review. *See Neal v. Gramley,* 99 F.3d 841, 844 (7th Cir.1996) (Posner, J.) (stating that the determination of whether plain error occurred "requires consideration of the merits," but it "does not open up the merits any wider for consideration by the federal court"). *See also Mack v. Caspari,* 92 F.3d 637, 641 (8th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1117, 137 L.Ed.2d 317 (1997) (stating that because the state court of appeals reviewed the claims for plain error, the federal court was also to review the claims for plain error).

■ Judge Ridgely instructed the jury that the State had the burden of proving statutory aggravating circumstances, not mitigating factors, beyond a reasonable doubt. Thus, when "viewed in the context of the overall charge," Judge Ridgely's instruction was fair and did not rise to the level of constitutional error. *See Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973) (stating that it is a "well established proposition that a single instruction to a jury may not be judged in artificial isolation"). Thus, under the plain error standard, the mitigating factors instruction was not so clearly prejudicial to Dawson's substantial rights as to jeopardize the fairness and integrity of the second penalty hearing. Accordingly, Dawson is barred from bringing the claim that the mitigating circumstances jury instruction violated his Eighth and Fourteenth Amendment rights.

### 2. *Did the Superior Court deny Dawson due process of the law during post-conviction proceedings?*

Dawson claims that he was denied due process of the law during postconviction proceedings in the Superior Court when Judge Ridgely "limited his rights to discovery, an evidentiary hearing and expansion of the record." Dawson presented this claim to the Delaware Supreme Court, and has therefore exhausted state remedies. *See Dawson IV,* 673 A.2d at 1197–98.

■ Claims attacking a state court's application of postconviction procedures do not state a basis for federal claim under 28 U.S.C. § 2254. *See Steele v. Young,* 11 F.3d 1518, 1524 (10th Cir.1993) (stating that the claim challenging the state postconviction proceedings "would fail to state a federal constitutional claim cognizable in a federal habeas proceeding"). *See also Duff–Smith v. Collins,* 973 F.2d 1175, 1182 (5th Cir.1992), *cert. denied,* 507 U.S. 1056, 113 S.Ct. 1958, 123 L.Ed.2d 661 (1993) (stating that "infirmities in state habeas proceedings do not constitute grounds for federal habeas relief"). Accordingly, this court will not consider Dawson's claim that the Superior Court's limitation of discovery during his postconviction proceedings violated his right to due process of the law.

### III. *CONCLUSION*

For the reasons set out above, the court finds that Dawson's claims for habeas corpus relief are procedurally barred, fail on the merits, or should otherwise be denied. Accordingly, the court will deny Dawson's petition for a writ of habeas corpus.

The court will issue an order in accordance with this opinion.